IN THE

# COURT OF ERRORS AND APPEALS

## OF THE STATE OF NEW JERSEY,

### ON APPEAL FROM THE COURT OF CHANCERY.

#### JUNE TERM, 1873.

BLACK and others, appellants, and THE DELAWARE AND RARITAN CANAL COMPANY and others, respondents.

| | |
|---|---|
| 24 | 455 |
| 50 | 65 |
| 24 | 455 |
| 53 | 448 |
| 53 | 511 |
| 24 | 455 |
| 56 | 600 |
| 61L | 100 |
| 24 | 455 |
| 58 | 101 |
| 58 | 110 |
| 24 | 455 |
| 59 | 265 |
| d59 | 274 |
| 59 | 276 |
| 59 | 501 |

1. The rule laid down by Parker, Master, in 1 *Stockton* 407, approved.

2. After shareholders in a joint stock company have entered into a contract among themselves, under legislative sanction, and expended their money in the execution of the plan mutually agreed upon, the scheme cannot be radically changed by the majority, by virtue of legislative enactment, and a dissentient stockholder compelled to engage in a new and totally different undertaking, without impairing his contract with his associates and with the state.

3. A lease of the corporeal works and property with the franchises to another corporation, for nine hundred and ninety-nine years, is such a novation of the undertaking as will impair the obligation of the contract.

4. In the exercise of the right of eminent domain, the legislature may authorize shares in corporations and corporate franchises to be taken for public uses, upon just compensation.

5. The legislature may, when public necessity requires it, grant authority to consolidate existing connected railroad routes, if they provide a just compensation for the shares of such stockholders as dissent.

6. The act of March 17th, 1870, (*Laws*, 1870, *p.* 916,) provides compensation for unwilling stockholders, before their property is taken.

7. That act does not authorize a lease to be made to a corporation not of this state. The rule of construction is settled, that what is not clearly granted is withheld. Any ambiguity in the terms of a grant, must operate against the corporation, and in favor of the public. To be in doubt is to be resolved, and every resolution which springs from doubt, is against the corporation.

8. In the court of last resort, no new facts can be introduced by testimony; the contest must be decided upon the case as it was before the Chancellor.

9. This court will not presume that the circumstances of the case have changed in any respect, since the preliminary injunction was. refused by the Chancellor.

The bill in this cause was filed to restrain the execution of a lease by the United Companies of New Jersey, of their works to the Pennsylvania Railroad Company. At the Term of October, 1871, the Chancellor delivered his opinion, refusing a preliminary injunction. From the decree made in accordance therewith, the complainants appealed to this court.

At the Term of June, 1872, the defendants moved for a rule to show cause why the appeal should not be dismissed, with leave to take affidavits to be read on the argument of the rule. The motion was granted,* and the following rule was thereupon entered:

"It having been suggested and shown to the court, by affidavits, that John Black and others, appellants in the above cause, and complainants in the bill filed in the Court of Chancery, have, since the bill was exhibited in the Court of Chancery in said cause, ceased to be stockholders in The Delaware and Raritan Canal Company, The Camden and Amboy Railroad and Transportation Company, and The New Jersey Railroad and Transportation Company, as described and set forth in the bill of complaint, and that the corporations last aforesaid, have become merged in the corporation known as The United New Jersey Railroad and Canal Company, in pursuance of the act entitled "An Act to amend

---

* Eleven judges concurring; two (Dalrimple and Depue) dissenting.

an act entitled 'An Act to validate and confirm certain agreements between the companies owning the railroad lines between New York and Philadelphia,'" which said act was approved March 14th, 1872.

"And further, that the said complainants in the Court of Chancery, and appellants in this court, *have ceased to have any legal interest in the cause aforesaid,* since the said decree was made, by reason of the fact that the proposed lease, in the bill of complaint set forth, has been delivered to The Pennsylvania Railroad Company, and that the last named company has gone into possession of the demised works and property, in the said bill in the Court of Chancery described, (the said bill being merely an injunction bill, to restrain the execution and delivery of the said lease,) and have expended, in pursuance of the power in the said lease contained, large sums of money on the demised works and property.

"And also, that the said complainants, in the said bill in chancery, and the appellants in this cause, have received dividends on the stock held by them in the said New Jersey Companies, which were paid by the said Pennsylvania Railroad Company as lessees, being a part of the rent in the said lease reserved, and have given receipts for such rent and dividends, whereby, as is alleged, they have ratified the said lease and have induced the said lessee to expend large sums of money, as aforesaid. And, also, that the legislature of the State of New Jersey have, since the delivery of the said lease, in effect ratified the same.

"It is thereupon ordered, on motion of I. W. Scudder, solicitor for the said appellees, that the appellants show cause, before this court, on the third Tuesday of November, 1872, at the State House, at the city of Trenton, or as soon thereafter as the said court shall be at leisure to hear the same, why the said appeal should not be dismissed, or for such other order as the case may require, and that either party have liberty to take depositions and produce exhibits in pursuance of this rule."

The rule was argued at November Term.

*Mr. I. W. Scudder,* (*Mr. Williamson* with him,) for the rule.

It is competent to produce evidence to show that since the order refusing the injunction, the lease was delivered and the lessees went into possession.

It is one of the necessary powers of the Court of Errors and Appeals to ascertain the true state and condition of the parties to any cause before them on appeal, and also of the property, estate, or interest involved in such cause. .

That court can be informed of the position of the parties to a cause, and the situation of the property involved in the appeal, either by the oral statements of counsel, by affidavits taken according to the rules of the court, or by depositions taken under the direct order of the court.

This court has provided for such power, by its own rules, which prescribe the mode of taking "affidavits to be used on any special motions or arguments in this court." *Nixon's Digest* 1117, § 34.

Such information as above indicated, which the court will obtain in the manner stated, is in no sense the introduction of new testimony in the cause, but is essential to the proper disposition of the cause before the court.

A complainant applies to the court of equity to enjoin the further prosecution of an action at law, the court of equity refuses the injunction, and the complainant appeals to this court from the order denying the injunction. If the party sought to be enjoined in the court of law should, after the denial of the injunction, proceed at law and obtain a judgment, does it not become imperative that this court should have full knowledge of such judgment, and of all the particulars touching the same? Such information could be obtained by a certified copy of the judgment record, or by a certified copy of a docket entry, or even by the oral statement of counsel.

The cases which establish the rule, that no other evidence in the cause in which an appeal has been taken is admissible, have no application.

To prove that a lease, the execution and delivery of which were sought to be enjoined in the court of equity, has, since the refusal of the injunction, been delivered, and the lessee gone into possession and improved the demised property, is in no sense evidence in the original cause, involving the propriety of granting the injunction originally, but relates only to the situation and condition of the property.

This court will be informed by affidavit, or by oral statement, of the death of a party.

*McCurdy et al.* v. *Agnew*, 4 *Halst. Ch. R.* 728. The death of the respondent in appeal was suggested, and the court was moved for an order making his administrators and heirs-at-law parties, and for an order of publication; some of the heirs-at-law residing in New York, and some being infants. This motion was allowed, and an order directed to be drawn according to the practice in chancery. In this case, not only the death of the party, but the residence and condition of the heirs-at-law were inquired into.

Pending an appeal, the court will, sometimes, stay the sale of property directed by the decree to be sold, but if the property consists of personal chattles, remaining in the possession of the appellant, he must give ample security for the value. *Nerot* v. *Burnand*, 2 *Russ.* 56.

This involves inquiry in the appellate tribunal. *Vail* v. *Remsen*, 7 *Paige* 206; *Lansing* v. *Caswell*, 4 *Paige* 516; *Hunt* v. *Wallis*, 6 *Paige* 371; *Rochfort* v. *Battersby*, 2 *Cl. and Fin., H. of L. cases*, 413. See also *Geils* v. *Geils*, 3 *Cl. and Fin., H. of L. cases*, 280; *St. Mary Magdalene* v. *Sibthorp*, 1 *Russ.* 154; *Idley* v. *Bowen*, 11 *Wend.* 238; *Lailette* v. *Van Keuren*, 7 *Howard Prac. Rep.* 499.

1 *Barbour's Ch. Prac.* 398: "The appellate court will give the complainant leave to amend by adding parties, in the same manner as upon an original hearing; and will order the hearing of the appeal to stand over for that purpose. And it has gone to the extent of allowing the complainant to

add the attorney-general as a party, either by converting the bill into an information and bill, or into an information only."

1 *Barbour's Ch. Prac.* 382: "But an appeal cannot be sustained by a person who is not interested in the subject matter. Although there may have been an interest when the suit was commenced, if such interest is terminated during its progress, his right to interfere further in the litigation is at an end."

*Pugsley* v. *Kisselburgh*, 6 *Selden* 420. "When the record does not show that the action was originally commenced in the justices court, that fact, on a motion to dismiss the appeal, may be shown by affidavit."

*Shank* v. *Shoemaker*, 18 *New York*, 4 *Smith* 489. Settlement shown by affidavit, and appeal dismissed.

The object having been accomplished, the lease having been delivered, and the lessee having gone into possession, it is competent for the Court of Appeals to be informed of that state of facts, and being so informed, the court will dismiss the appeal.

*The Trustees of Huntington* v. *Nicoll*, 3 *John. Rep.* 558. No appeal lies from a temporary order of the Court of Chancery awarding an injunction; and such an order having expired, the appeal was dismissed.

The injunction order appealed from, was to restrain Jesse Wickes from proceeding to trial in any of the suits at law at the Circuit Court Term next to be held in the county of Suffolk.

Present this bill to the Chancellor as the matter now stands, and there could be no injunction. There is nothing to enjoin as the bill stands, for the reason that the thing to be enjoined has been executed.

If this court should determine that the Chancellor erred in the exercise of his discretion to refuse an injunction, such determination would be of no practical importance, as the Chancellor, on a remittitur, could not now enjoin.

On a mere injunction bill, after execution and delivery of the lease, there could be no decree in a court of equity in

accordance with the prayer of the bill or the general purpose of the bill.

Suppose a bill filed to enjoin an election of directors by a corporation, and the injunction refused, an appeal taken, and the election subsequently held and acts done by the corporation, would the Court of Errors entertain the appeal?

In New Jersey, an appeal from the order or decree of the Chancellor does not stay proceedings in the Court of Chancery; but it is left to the discretion of the Court of Chancery, or the Court of Appeals, to stay further proceedings in the cause before the Chancellor. The former practice in New York was different. *Schenck* v. *Conover*, 2 *Beasley* 32.

Inasmuch as under the New Jersey practice the appeal does not stay further proceedings, and does not leave the parties in the same condition with reference to the subject matter of the litigation in which they were at the time the appeal was taken, it would lead to absurd consequences to entertain an appeal from an order refusing an injunction after the act sought to be enjoined had been consummated.

After the order refusing the injunction, there was no stay or continuance of the injunction until the Court of Appeals should meet. No application was made to the Court of Appeals for an order that the injunction be continued, upon the coming in of the appeal.

It was, therefore, clearly the duty of the complainants, after the refusal of the injunction, if they desired to continue the litigation, to have filed a supplemental bill, and on the final hearing they could have rectified the error, if any there was, in refusing the injunction.

*Att'y-General* v. *N. J. R. R. & T. Co.*, 2 *Green's Ch.* 141. " The injunction is a preventive remedy. It interposes between the complainant and the injury he fears or seeks to avoid. If the injury be already done, the writ can have no operation, for it cannot be applied correctively, so as to remove it," &c.

An injunction cannot be used to compel the lessee to redeliver the lease to the lessors, and to restore or attempt to

restore the parties to their former situation. *Rogers Locomotive and Machine Works* v. *Erie Railway Co.*, 5 *C. E. Green* 391 ; *Fleischman* v. *Young*, 1 *Stockt.* 623 ; *Coryell* v. *Holcombe, Ibid.* 653.

It is not a matter of fixed and settled right in New Jersey, that when the Chancellor on bill and answer declines to enjoin, the complainants' appeal to the Court of Appeals from such refusal will be sustained. *Chegary* v. *Schofield*, 1 *Halst. Ch.* 595 ; *Doughty* v. *The Somerville, &c., R. R. Co.*, 3 *Halst. Ch.* 629.

In the case of the *Attorney-General* v. *The City of Paterson*, 1 *Stockt.* 625, the injunction in the first place was refused, and the appeal entertained from the refusal. The case has less weight, because the Court of Appeals agreed with the Chancellor on the merits of the question. Chief Justice Green was of the opinion that no appeal would lie in such a case.

In case an injunction is refused, no affirmative order is made whatever.

In *Morgan* v. *Rose*, 7 *C. E. Green* 584, 593, and 594, an injunction was ordered, and after answer was filed, and motion to dissolve the injunction, was continued. There was then an appeal from the order of the Chancellor under which the injunction stood. The Court of Appeals sustained the injunction.

*Mr. P. L. Voorhees* and *Mr. Browning*, contra.

The rule was discharged,* and the argument of the cause ordered to be proceeded with at the next Term.

The appeal was argued by
*Mr. P. L. Voorhees, Mr. Gilchrist*, Attorney-General, and *Mr. Browning*, for appellants.

---

* No vote was taken in open court, upon the question of dismissing the appeal. It does not therefore appear how the court stood upon that question.

*Mr. I. W. Scudder*, *Mr. Williamson*, and *Mr. Theodore Cuyler*, for respondents.

The opinion of the court was delivered by

VAN SYCKEL, J.

The bill in this case was filed to enjoin the United Companies of New Jersey from executing a lease of their roads and canal to the Pennsylvania Railroad Company for the term of nine hundred and ninety-nine years. The facts of the case are fully stated in 7 *C. E. Green* 130.

The Chancellor refused to grant a preliminary injunction, whereupon the complainants brought their case by appeal into this court for review. The questions upon which this contest must, in my judgment, be determined, will be considered without a further recital of facts.

A copy of the proposed lease appears in the proceedings, and it is admitted that at the time of filing the bill its execution was imminent.

1. Was it within the power of the defendants, without the sanction of express legislation, to make such lease ?

There is an implied contract as well between the United Companies and their stockholders as between the companies and the state, that their corporate franchises, powers, and property shall not be appropriated to uses or purposes not contemplated or authorized by their charters. As corporations, any action outside of the limits marked out for them in the legislative grant, is *ultra vires*.

In the language of Master Parker, in 1 *Stockton* 407, " The stockholders own the road in common, to be employed in specified uses. Each owns a share in the whole, and is to have a proportionate share in its profits. They have invested a portion of their capital in it, and in it alone. They have a right in the road, and in every dollar it earns. The directors are their trustees, to employ the joint capital in the management of the road, and the road only, to the end that from the investment the stockholders have chosen they may

reap the contemplated profits.  And this is the agreement of
the stockholders among themselves.  They each contract
with the other that their money shall be so employed.  What
the majority determine within the scope of this mutual con-
tract they each agree to abide by, but there their mutual
contract ends, and no majority, however large, has a right to
divert one cent of the joint capital to any purpose not con-
sistent with and growing out of this original fundamental
joint intention." *Clearwater* v. *Meredith,* 1 *Wallace* 40 ;
*Coleman* v. *East. Coun. R. Co.,* 10 *Beavan* 1; *Salomons* v.
*Laing,* 6 *Railw. Cases* 289 ; 1 *Dr. & Sm.* 794; *Zabriskie* v.
*The Hack. & N. Y. R. Co.,* 3 *C. E. Green* 183.

This is familiar law, running through all the cases, and
cannot be controverted.

The test is, whether the proposed lease for nine hundred
and ninety-nine years is such a novation of the undertaking
as will impair the obligation of the contract with such stock-
holders ?

The certificate for stock declares that the holder is entitled
to a certain number of shares of the capital stock, which
consists of the corporeal works and property, with valuable
franchises to be used by the corporation for their profit, by
the taking of tolls and fares; with the right to acquire and
dispose of such property as may be essential in the legitimate
exercise of their functions, under the management and con-
trol of directors, of which any corporator, by and with the
consent of the requisite number of his associates, may be one.
The prospect of increased gains, consequent upon the growth
of population, and added business, is a valuable incident also
to the ownership of the stock.  Such are the rights vested in
the stockholder under the law and by virtue of his engage-
ment with his associates, before the lease is effected.

After the lease takes effect, his company is denuded of all
these corporeal, substantial properties, its structure for the
next nine hundred and ninety-nine years is totally altered,
and instead of what he before possessed, he would be com-
pelled to accept an annual rent, fixed without his concurrence,

and secured by the personal responsibility of the corporate lessee; for pending the term, which is perpetual for all practical purposes according to our allotted years, the visible, tangible assets would be dissipated and decayed. The right of re-entry can scarcely be entitled to the name of security.

The shareholder would still have the paper upon which his certificate is printed, but in place of the earnings, he must be content with a share of the reserved rental in a corporation possessed of the single faculty of maintaining its organization for the distribution of such rent, stripped of all the franchises for the exercises of which it was founded. Without his consent, and against his protest, he would lose his share in the old thing, and be forced, as an unwilling captive, into a new and wholly different venture. A statement of the consequences which necessarily flow from this project, demonstrates the futility of attempting to establish it without legislative consent.

Equity looks at the substance of things, and not at mere names. For all substantial, practical purposes, a lease for nine hundred and ninety-nine years is a conveyance in fee. It would carry us to a period as distant in the future, as the time of Alfred the Great is remote in the past, and if our courts should permit corporations, without legislative authority first had, to make any disposition of their entire franchises that a controlling interest might determine upon, the private rights of minorities would be no more secure against invasion now, than they were in those semi-barbarous days.

It may also be considered as settled, that a corporation cannot lease or dispose of any franchise needful in the performance of its obligations to the state, without legislative consent. Nor is the difficulty avoided by the proposition that a corporate body, by and with the assent of a majority of the corporators, may abandon their business. Even if this was true, upon such dissolution, the franchises could not be transferred, but would revert to the sovereignty from which they were derived, and the shareholders would become partners or

joint owners in the assets, and for their share in such assets, they could not be compelled to accept an annual rent for nine hundred and ninety-nine years.

There is another obstacle in the way of a lease without the sanction of positive law.

" Every state has within its own limits exclusive sovereignty over all matters touching the title to real and personal property, the modes of its transfer, the rights of persons and artificial bodies, in short, everything pertaining to the functions of government, subject only to its obligations to the general government."

One state cannot, therefore, by its laws, govern in these respects within the jurisdiction of another, although, by comity, a foreign corporation will be recognized, and be permitted to enjoy certain rights in a state to which it does not owe its existence. But a domestic corporation could not convey its franchises to a foreign corporation, so as to enable the latter to accept and exercise such franchises within our territorial limits, without the assent of our legislature.

Chief Justice Taney, in *The Bank of Augusta* v. *Earle*, 13 *Peters* 519, 588, lays down the rule more broadly than this.

2. Having reached the conclusion that the proposed lease will work a radical change in the purposes for which the defendant corporations were established, let us consider whether the legislature can empower these corporations, by the consent of any number of the shareholders less than the whole, to alter, fundamentally, the character of the enterprise, and compel dissentients to engage in it ?

Since the famous Dartmouth College case, this is hardly debatable ground.

The true doctrine is forcibly announced by Chancellor Zabriskie, in *Zabriskie* v. *The Hackensack and New York Railroad Company*, 3 *C. E. Green* 183, as follows :

" It is also settled upon the principles of the common law, in this state, and most of the states of the Union, that when a number of persons associate themselves as partners,

for a business and time specified in the agreement between them, or become members of a corporation, for definite purposes and objects specified in their charter, which, in such case, is their contract, and for a time settled by it, the objects and business of the partnership or corporation cannot be changed, or abandoned, or sold out, within the time specified, without the consent of all the partners or corporators; one partner or corporator, however small his interest, can prevent it.    And this is so, although by law a majority in either case can control or manage the business against the will and interest of the minority, so long as it is within the scope of the partnership or charter.    This rule is founded on principle, the great principle of protecting every man and his property by contracts entered into; a guiding principle in all right legislation, and incorporated into the constitution of the United States, and of almost every state of the Union.    And the rule is not changed because the new business or enterprise proposed is allowed by law, or has been made lawful since the association was formed."

The rule is clearly stated by Chief Justice Lowrie, in *Lauman* v. *The Lebanon Valley R. R. Co.*, 6 *Casey* 46, in these words:

"The dissentient stockholder may object that his co-corporators have no power to make a new contract for him, and thereby constitute him a member of a new and different corporation; for it is of the very nature of a contract relation, that it can be instituted only by real parties to it, unless it be a mere constructive contract, which is only a convenient form or fiction of law, invented to enforce a corresponding legal duty.    He may object, that even the legislature cannot authorize this, for by so doing they would authorize the destruction of one private contract, and the compulsory creation of another in its stead, and would take away the remedy by due course of law, which the dissenting stockholder is entitled to, because of the departure or diversion of the association from its agreed purposes; and would, besides this, change the essential nature of contracts, which

even legislative power cannot do, and much less legislative authority.

It is unnecessary to multiply authorities; the cases will be found in the report of this case in 7 C. E. Green, and in the other cases referred to.

The proposition now considered is whether, after shareholders have entered into a contract among themselves under legistive sanction, and expended their money in the execution of the plan mutually agreed upon, the scheme can be radically changed by the majority, by virtue of legislative enactment, and a dissentient stockholder compelled to engage in a new and totally different undertaking, without impairing the obligation of his contract with his associates and with the state? That this cannot be done, is as well supported by every consideration of justice and right, as it is firmly imbedded in judicial decision.

3. From the conclusions thus far reached, does it result, that one unwilling stockholder may obstruct the growth and development of every enterprise of this character in which he may have participated, and thus hinder the union under one management, of these important public highways, which have been constructed at different periods and under separate charters, when the necessities of inter-state commerce, and the convenience of public travel may unite in urging it? Shall a railroad from Philadelphia to Trenton never be extended so as to connect the two great cities of our union, while one obstinate associate stands in the way?

The necessity for rapid and speedy transit seems to demand, imperatively, that this difficulty shall not be insurmountable.

In the exercise of the right of eminent domain, the legislature may authorize shares in corporations, and corporate franchises, to be taken for public uses upon just compensation. The title to this species of property is no more secure against invasion, when the public uses require it, than is the ownership of real estate. Under this paramount right in the

public, subject to which all private property is held, the franchises of one corporation have been, and may be taken and bestowed upon another.

The established rule upon this subject is most clearly announced in *The Tidewater Co.* v. *Coster*, 3 *C. E. Green* 521, in these words : "It is one of the legislative prerogatives to decide the important question, whether an enterprise or scheme of improvement be of such public utility as to justify a resort for its furtherance to the exercise of the power of taxation or eminent domain. Primarily, the judiciary has no concern in such matters. And not only this, but if the public interest be involved to any substantial extent, and if the project contemplated can, in any fair sense, be said to be promotive of the welfare or convenience of the community, the legislative adoption of such project is a determination of the question, from which there is no appeal, and over which no other branch of the government has any supervision whatever. Whether a road, a turnpike, a bridge, or a canal will subserve the public or private needs, are inquiries addressed exclusively to the law making power, whose answer, according to the genius of our government, must be final and irreversible."

Private property can be taken by these corporations for public use, only when the public necessity requires it. If the legislature charters a new railroad route, the presumption, without a declaration of that fact, is, that in the opinion of the lawmaker, the necessity has arisen ; so, when authority is granted for the consolidation of existing connected routes, the presumption flows from the fact of the enactment being made, that the legislature decided upon its necessity. This results from the familiar rule, that every intendment will be made in support of the constitutionality of the acts of a co-ordinate branch of the government.

The United Companies are *quasi* public corporations, charged, in the exercise of their corporate functions, with certain duties to the public, in the transportation of freigh

and passengers between given points. The consolidation of these roads with other existing lines, under unity of management, might promote the convenience and speed of passenger travel, save the reshipment of freight, and avoid the disturbing question as to which of several carriers through an extended route is liable for goods lost in transportation, and from the passage of the act, we must conclude that such was the opinion of the legislature.

In this busy age of restless activity and enterprise, when the brain of man is exhausting itself in his struggle with time and space, the two forces that most oppose his progress, the taking of private property in the stock of such corporations to advance any of the purposes above indicated, must be regarded as the taking of it for public benefit. There can be no doubt that a railroad company may be empowered to extend their road beyond the point to which it was built under the original grant, if proper compensation is provided for stockholders who may resist it, and I can see no difference in principle, whether the original company, in order to secure a through route under one management, is authorized to take the lands of individuals, or to take the property which individuals have in the stock of an existing road. In the first case, for the purpose of establishing the through route, one kind of private property, to wit, the lands of individuals are taken by the corporation; in the second case, another kind of property, to wit, the shares of stock of individuals, in an existing company, are authorized to be condemned. In the latter instance, the use is as clearly a public use as in the former, and when the legislature declares that it may be done it is no more necessary to declare in the grant that public necessity requires it, than it is essential, in order to validate a railroad charter, that there should be an express announcement by the legislature, that it is in aid of public uses. The same rule applies to both cases, unless property in stock can claim a superior right to protection. This, with all other private property, is held under the dominant right of eminent domain.

In *White River Turnpike* v. *Vermont Central Railroad*, 1 *Amer. R. Cases* 237, the court says: " It now appears to be too well settled by authority to be controverted, that there is no implied contract by the state in a charter of a turnpike or other private corporation, that their property, or even their franchise itself, shall be exempt from the common liability of the property of individuals to be taken for the public use ; it may be taken on proper compensation being made."

To the same effect, is the *Enfield Bridge Company* v. *Hartford and New Haven Railroad*, 2 *Amer. R. Cases* 105, in which it is declared " that this bridge company has the same right to be protected and secured in the enjoyment of its property and franchises as the other citizens of the state ; and the legislature has the same right, by virtue of its power of eminent domain, to appropriate them for the public use, and upon the same terms."

This rule was fully recognized by Judge Daniel in *West River Bridge* v. *Dix*, 6 *Howard* 529, and by Judge Grier in *Richmond R. Co.* v. *Louisa. R. Co.*, 13 *Howard* 78; and in other cases cited in the notes to *Redfield on Railways*, title, " *Condemnation of Franchises.*"

But in no case is the doctrine and the reason upon which it rests more forcibly stated, than by Justice Bigelow in the *Central Bridge Corporation* v. *City of Lowell*, 4 *Gray* 481. He holds that the principle is too well settled by the highest authority, to be open to question. That it rests on the basis that public convenience and necessity are of paramount importance and obligation ; to which, when duly ascertained and declared by sovereign authority, all minor considerations and private rights and interests must be held in a measure, and to a certain extent, to be subordinate. By the grant of a franchise to individuals for one public purpose, the legislature do not forever debar themselves from giving to others new and paramount rights and privileges, when required by public exigencies, although it may be necessary in the exercise of such rights and privileges to take and appropriate a franchise previously granted. If such were the rule, great public im-

provements, rendered necessary by the increasing wants of society, in the development of civilization, and the progress of the arts, might be prevented by legislative grants, which were wise and expedient in their time, but which the public necessities have outgrown and rendered obsolete.

The contrary doctrine would place an impassable barrier in the way of the great through routes.

Authority to one railroad company to take, by condemnation, the franchises of another, which could not be a link on a through or connected route, would be an extreme case. That could be demanded by no apparent public exigency, and it would be the duty of the courts to declare it to be the taking of private property for private uses.

I cannot agree that the act of 1870 is subject to the criticism, that it delegates to the United Companies the right of judging what constitutes a public use sufficient to justify an exercise of the right of eminent domain.

The legislature must be presumed, by the enactment of this law, to have decided that the public good would be advanced by a consolidation with any other road of the character specified. Whether they would unite was left to their own option. The companies are to decide, not whether the public necessity demands the consolidation with any one or more of the roads of the designated class—that has already been passed upon by the lawgiver, but whether their own private interest is beneficially affected by it. A railroad charter does not oblige the corporators to construct the road, and if a charter authorized a trunk line, with lateral roads, to connect with any other railroads in the county of Mercer, it would scarcely be contended that such act was void, because the legislature did not define where it was necessary to locate lateral branches, but referred that question to the option of the corporators themselves. The obvious answer to the objection would be, that the legislature considered that the public uses would be aided by connections established anywhere within the county; so, in this case, that the public con-

venience would be consulted by a consolidation of the United Companies with any other road of the class specified.

The conclusion reached on this point is very clearly and fully supported by the opinion of Justice Bedle, in *Matter of application for the drainage of lands*, 6 *Vroom* 497. In my judgment, the act of March 17th, 1870, so far as it authorizes a consolidation of railroads, is a ligitimate exercise of the law making power, if provision is made in due form for extinguishing private rights.

1. Is compensation provided by the act of March 17th, 1870, for unwilling stockholders, before their property is taken ?

The act directs that if any stockholder, being such at the time of the consolidation or lease, shall be dissatisfied with the same, the said companies shall pay to such dissentient, the full value of his stock, immediately prior to such consolidation or lease, to be assessed by three disinterested commissioners, to be appointed by the Supreme Court or Court of Chancery, on the application of either party on twenty days notice. The party to be so remunerated must be a stockholder at the time of making the lease, and he shall receive its full value immediately prior to the making of the lease. If the mere delivery of the lease is a taking of the property of the dissenting stockholder, compensation under this act cannot possibly be made to him before his property is taken, for he must be a stockholder at the time of making the lease, and must receive its value immediately before that event. This act must be construed in a reasonable way, so as to effectuate the intention of the lawmaker, and at the same time secure to the individual that protection which the constitution guarantees to him. The making of the lease is the initial step in the assessment to the resisting shareholder, and it is necessary in order to fix with certainty who shall be entitled to compensation. The delivery of the lease does not constitute a taking by the lessee. The shareholder still has his shares, and his company are yet in possession of all their properties

and estate, until such possession is actually passed to the corporate lessee.    Such possession the lessor has no right to deliver, and he will be enjoined from doing so, until compensation first made.

A. bill filed before the lease is executed, to inhibit such delivery of possession, would furnish ample and complete protection, and is all the relief that a stockholder, under such circumstances, would be entitled to.

5. The question of difficulty in this case, is whether the act of 1870 authorizes the lease to be made to the Pennsylvania Railroad Company, a corporation not of this state. The rule of construction is settled, that what is not clearly granted is withheld.

In *Townsend* v. *Brown*, 4 *Zab.* 87, Chief Justice Green says, that " it is a rule of construction no less wise than clear, that in all cases of public grants, the interpretation shall be most favorable to the public, and most strongly against the grantee.    The rule is founded in wisdom.    All experience teaches that public rights are yielded to private interest with sufficient alacrity.    If the legislature really design to grant to individuals the right of several fishery below low water mark, it is easy to do so in plain and express terms.    It is far better that the right should be unequivocably settled by legislative interference, than that public rights should be frittered away by the aid of judicial construction."

And in a later case, reported in 1 *C. E. Green* 372, the same great jurist says, that " any ambiguity in the terms of the grant must operate against the corporation, and in favor of the public.    The corporation take nothing that is not clearly given by the act."

In language equally strong, the court, in 9 *Harris* 22, hold, that " in the construction of a charter, to be in doubt is to be resolved, and every resolution which springs from doubt is against the corporation.    This is the rule sustained by all the courts in this country and in England."

Under this rigorous rule of interpretation, can the power claimed by the United Companies be found in the act of 1870 ?

The language of the act is : " That it shall be lawful for the United Companies, by and with the consent of two-thirds in interest of the stockholders of each, expressed in writing, and duly authenticated by affidavits, and filed in the office of the secretary of state, to consolidate their respective capital stocks, or to consolidate with any other railroad or canal company in this state, or otherwise, with which they are or may be identified in interest, or whose works shall form with their own continuous or connected lines, or to make such other arrangements for connection or consolidation of business with any such company or companies, by agreement, contract, lease, or otherwise, as to the directors of said United Companies may seem expedient."

No power is given to lease to a company out of this state, unless the word " otherwise," which is not an adverb of place, is held to mean " otherwhere." It is an inappropriate word to express such meaning. In truth, it would be the displacing of a word which has no such meaning, by one which has, when it is obvious, from a subsequent part of the same section, in which " otherwise " is used, that the drafts-man of the act had in his mind its true signification.

It might with much plausibility be urged that the true reading of the act was intended to be " that it shall be lawful for the United Companies to consolidate their respective capital stocks, or otherwise to consolidate with any other railroad," &c. And if we could find any authority that would warrant us in substituting the word " otherwhere " for " otherwise," there are other limitations upon the power to lease.

1. The lessee must be identified in interest with the lessor, or,

2. The works of the lessee shall form with the works of the lessor continuous or connected lines.

The preamble of the act defines what the legislature meant by " identity of interest," by declaring that the United Companies have an identity of interest with the Philadelphia and Trenton road. No such identity of interest exists between the United Companies and the Pennsylvania road.

Do the parties occupy the other essential relation towards each other ? Is it quite clear that there must not be continuity or connection between the works of the United Companies and the authorized lessee, so that the lessee's works shall form with the lessor's the continuity or connection ?

That reading would exclude the proposed lessee, whose works are separated from the lessor's by the Philadelphia and Trenton road, and by the Delaware bridge.

A clear expression of the power is not to be found in this act ; it depends for its existence upon an artificial construction. If, failing to find such expression, we resort to construction, we must be quite sure that it is free from reasonable doubt, that some other one of the interpretations suggested does not truly express the legislative intent.

If it is held that the lease may be made with any road in or out of the state, with which the United Companies are connected by means of any intervening road or canal, they may unite with almost any road in the whole country, and it may be with roads abroad, if they were connected by means of steamships. There should be a very clear expression of a power so extensive and extraordinary as this.

After the most careful and oft repeated consideration of this act, I am constrained to say that I do not know what the intention of the law maker was. To be in doubt, in the language of the books, is to be resolved, and I cannot, without disregarding all authority and making new law for the case, hold that power is given to execute the lease in question.

In the late case of *Stevens* v. *Paterson Railroad,* 5 *Vroom* 537, it was most distinctly ruled, that a grant from the state will not be deduced from the words of a statute, except when

it contains language not susceptible of any other rational construction. In that case it was an attempt to establish a grant from the state of its interest in lands; in this case it is an attempt to assert a right by virtue of a grant from the state to take the property of the individual citizen, under the state's power of eminent domain. The like rule must apply to both cases.

If a right, comparatively unimportant and not materially affecting other parties, was being asserted by force of this en-actment, the rigidity of the rule might be relaxed with less serious consequences. But where, as in this case, an act is invoked to justify the exercise of the highest power of the state's sovereignty over individual property, the established rule of construction, which is founded in the clearest public policy, cannot be overthrown, and should not in the slightest degree be disturbed.

The suggestion that this court should not interfere because the status of the case may have changed, pending the delay that has ensued since the decree below, should not be consid-ered now. For that delay the appellants are in no wise responsible, and if presumption is resorted to, the presump-tion will be that things remain in *statu quo*. I could never unite in an answer to these appellants who appealed promptly and have pressed their case persistently, that we will make a presumption against them, and dismiss them without relief, because we did not hear their grievances at an earlier day.

In this court of purely appellate jurisdiction, the struggle must be decided upon the case that was made before the Chan-cellor; no new facts can be introduced here by testimony. This question was most ably discussed on the motion to dismiss this appeal, and it was so held by a very decided majority of a full court. That decision is authoritative until reversed.

In the very recent case of *Morgan* v. *Rose*, 7 *C. E. Green* 583, this court concurred unanimously in holding that an appeal would lie from an order refusing a preliminary injunc-tion. If we now affirm, on the presumption that the circum-

stances may have changed since the injunction was refused, we must make the same presumption in every case of this kind. The result then is, that although an appeal will lie from such refusal to grant a preliminary injunction, the court will never, in such cases, reverse, but always affirm. This is far worse than to abrogate the rule at once, for it would be a delusion to suitors to invite them to come here for relief, with no possibility, under any circumstances, of obtaining it. The undeniable effect of this doctrine is, that no appeal in such case lies. That would make new law for this case. No evidence can be introduced before this court to show any change in this cause; but the proposition is, that the decree should not be reversed through apprehension that the parties do not occupy the same position that they did below Suppose it should appear before the Chancellor, when a case is on that ground affirmed and remitted, that the situation of the parties is in all respects the same, in what attitude would that place this court, and what would the Chancellor do? He would have no instructions from this tribunal, his own opinion would stand unreversed, as law, the party could have no relief from him, and if the case could be again appealed, it would come here to be sent back by us without passing upon the merits, through the same fear that it did not maintain its original standing; an endless circuity of proceeding, with no possible relief to the party taking it. If this is the precise value of an appeal from an order refusing a preliminary injunction, it is safe to affirm that no one will ever resort to it.

But if we do enter into the region of surmise in this case, what would the presumption be? The complainants file their bill denying the right of the lessors to execute the lease, and ask to arrest it. Immediately on the denial of the injunction, an appeal is taken and pressed with all due diligence to a hearing here. Pending this litigation, would it be fair or reasonable to suppose that a prudent man would either give or accept a lease? I cannot suppose that he

would, and in this view I am confident the great majority of minds would concur. The fact that two years have elapsed, can make no difference; the lease, if parties were so reckless as to enter into it, under such circumstances, could have been executed in one day or one week, as well as in one year. There is another rule of law which excludes such presumption. There is no authority to enter into the lease; it would be a wrongful act, and no presumption will be made, that a party has committed an unlawful or unauthorized act. Suppose this court was asked to take some right from these defendants, on the presumption, without proof, that they had acted unlawfully— the appeal would not be listened to; why, therefore, make such presumption in order to maintain them in what they have wrongfully done? This court is called upon to go much further than this. The defendants have proposed, unlawfully, to make a lease, and after bill filed to stay it, this tribunal is asked to assume, without any proof whatever, that they have actually done the illegal act, and therefore to punish the complainants because they are in the right.

No case can be found in this country or in England, where any purely appellate court has gone outside of the record, and permitted new evidence to affect the rights of parties. What, then, will the impartial mind say to the insistment, that while we will refuse to act intelligently, by allowing evidence to be taken to show what the facts really are, we should guess what the facts are affecting such important interests. The judicial mind has no right to balance probabilities in regard to matters as to which no testimony has been or can be taken.

If, however, there has been any legislative interpretation given to the act of 1870, by subsequent legislation, such legislation may have an important bearing on the rights of these parties, but it must be left to the court below to consider it, if proper, when the case is remitted. No public act affecting the rights of these parties, has been passed

since 1870, and this court cannot judicially take notice of any private act.

The further question is raised in this case, whether the Pennsylvania road, and the Philadelphia and Trenton road, are necessary parties?

The Pennsylvania road has no legal or equitable rights which the bill seeks to affect, nor does it appear that it has entered into any agreement, by parol or otherwise, to execute the lease, or even advised or consented to it.    *Quod non apparet non est.*   There would seem to be a propriety, therefore, in omitting a party, that might come in and demur on the ground that it had not participated in the alleged wrong, and had no interest in the contest, and did not wish to join in the litigation.   This consideration, added to the fact that this objection was not decided by the Chancellor, and that this party, if it becomes necessary in the progress of the cause, may be joined in the court below, is to me a convincing reason, why the case should not be made to turn on this point.

In *Cutler* v. *Tuttle,* 4 *C. E. Green* 556, this court declared that it was not an insuperable obstacle in the way of proceeding to a final decree, that all persons who should be parties to enable the court to adjust and determine all conflicting interests in the subject matter, have not been made parties to the suit.   And in that case, a final decree was actually made in the absence of an admitted necessary party.

In the case of Morgan *v.* Rose, before referred to, which was an appeal from an order of the Chancellor granting a preliminary injunction, His Honor, the present Chief Justice, with the concurrence of the entire court, held that—

" The Baptist Church of Camden," which had been omitted, " was a necessary party to the suit.   Without its presence the decree, if adverse, would not bind it, nor, if in its favor, could it claim for such decree that quality of conclusiveness which, in legal theory, is deemed to attach to every determination of a court."   But he refused, on that ground, to reverse, using this unmistakeable language :   " Upon the

argument it was assumed that if this defect existed, the injunction must fall. But this is a fallacy. The general principle undeniably is, that a decree or order will not be made, affecting the rights of an absent party. But this rule, like most general rules, is liable to the control of the equities of the particular case, for it is but seldom that in a court of equity, a mere form can defeat the ends of justice." And in that case, notwithstanding the absence of an essential party, the opinion most ably discusses, and this court decided the entire merits of the controversy. I concurred in that opinion, and am not prepared to change my views.

The Philadelphia and Trenton road occupy a different position. By the pleadings, it appears that the United Companies own a majority of the shares in the capital stock of the Philadelphia and Trenton road, and that by an agreement between these companies, antedating the time of filing the bill, there is a community of dividends between them. The dividends to be received by the shareholders in the Philadelphia and Trenton road, would be regulated by the lease. It may well be, therefore, that the latter company is a necessary party, but to affirm on that ground, would put the case upon the merest technicality.

The case shows that the United Companies own a majority of the stock, and are the substantial and beneficial owners of the Philadelphia and Trenton road, and are in the actual possession and control of it, so that the latter road, though not technically, is yet substantially here, and has defended this case as fully as if an actual party.

I cannot consent to disregard the important questions presented for our solemn adjudication, and put the case upon such narrow ground. To affirm in this case for that reason, would in all cases of this nature, where the injury was impending, give the alleged wrong doer full time to execute his purpose, and thereby work irreparable injury. There is nothing in the case to justify it. When the cause is remitted, this party may be brought before the Chancellor, and they could then set up any change which has occurred in the status

of the case, or any conduct on the part of the complainants since the decree below, which should operate as an equitable estoppel.

This court having decided at an earlier stage of the cause, that as a court of review it had no power to receive evidence of facts occurring since the preliminary injunction was denied, we must hear this case as if no change had been made.

If the Chancellor had considered this corporation to be a necessary party, the danger of injury being imminent, he should have granted a temporary order arresting the execution of the lease, and directed the omitted party to be brought in. Equity never allows its rules of procedure, which are within its own control, to be so applied as to enable the adversary to defeat and destroy, before hearing, the essential rights which are sought to be saved.

The question as to parties, although raised in the court below, was not decided by the Chancellor. He discussed the merits of the controversy, establishing the law of the whole case. Upon these vital issues affecting their most material property rights, the appellants justly claim the judgment of this court, and we cannot deny it upon an assumption that may prove to be false and wholly unauthorized. Every material fact that could possibly have affected the result was as fully presented in the court below as it possibly could have been by any new party. If we affirm for want of this party, and the case is remitted, assuming, as this court has decided it must, that the facts are unchanged, the new party will be added below, and the same questions which we would refuse to pass upon, are immediately raised again for our determination. Such circuity is neither just to the parties, nor compatible with the fair administration of the law.

In the *New Jersey Franklinite Company* v. *Ames,* 1 *Beasley* 510, so great an authority as Chancellor Green held that this court must say whether or not the Chancellor erred upon the case before him, and that to introduce here new parties or new facts, or to undertake to settle what the Chancellor never

heard of in the case before him, would be "bold and law-less usurpation of original jurisdiction."

The question submitted for review is, did the Chancellor do right in the case as it was made before him? Not what he ought to do in some other supposed possible case. And if he did not do right, what ought he to have done?

The appellants are entitled to have this question answered by this court.

In my opinion, therefore, the decree of the Chancellor should be reversed, with costs in this court and in the court below; and the case should be remitted with an order that the injunction do issue, unless it appears by such proceedings as may properly be taken in the court below, that some essential change, since the order now reviewed, has taken place in the status of the case, by reason of which the equities are changed or a different mode of relief has become necessary.

If the case is unchanged the injunction must issue; if any new equities have attached to the case, which is possible in every case, or any additional legislation has been had, its effect must be passed upon by the Chancellor before it can be considered in this court of review.

DALRIMPLE, J.

I concur in the opinion read by Judge Van Syckel, save as to the constitutionality of the act of 1870. I think that act unconstitutional, principally for the reason that it authorizes, in substance and effect, the taking of the private property of a certain class of the stockholders of the United Railway and Canal Companies, for an alleged public use, without their consent, and without compensation first made, as required by *Paragraph 9, of Section VII of Article 4* of the constitution of this state. Besides, I am not satisfied that the act, if it admits of the broad construction contended for by the appellees, is not for other reasons, not now necessary to be discussed, in violation of the constitution.

I therefore vote to reverse the decision of the Chancellor, to the end that the case may be remitted to the court below, and

there proceeded with according to the law and the practice of that court.

BEASLEY, CHIEF JUSTICE, dissenting.

If I felt called on to express an opinion on the legal merits of this case, as they are now presented to this court, the only difficulty which, as at present advised, I should have in coming to a conclusion, would be with respect to the effect to be given to the act of the 17th of March, 1870. This is the law which, it is contended, authorizes the lease in controversy, and the question whether it confers such power, is, it is admitted, fundamental to the case of the respondents. No one pretends that such an instrument could be legally made in the absence of a legislative sanction. But if I could conclude that this act confers the requisite power, and I deemed the occasion appropriate for the expression of a judicial decision, I should, under the force of present impressions, vote to affirm the decree which has been brought here by this appeal. Not that I should be willing to assent to the idea that the legislature, and a majority of the stockholders of a corporation, can, against the wishes of, and without compensation to, the minority of the members, alter, in any essential particular, the constitution of the company, or the object for which the body corporate was created. Nor could I agree to the other proposition, that the converting, for a long period of time, of the stockholders of a railroad company into the lessors of a railroad, was not such a material change of corporate organization and purpose, as is prohibited by the law under the conditions mentioned. But assuming that the statute referred to confers the leasing power, I think the exercise of such power could be vindicated on the ground that provision is made, in this law, for the payment to the dissentient stockholders, of an equivalent for their interest in the company. Nor do I find this provision open to the objection which was so forcibly urged against it, that it does not require such payment before the taking of the property sought to be condemned, because, I

think, that by a reasonable construction of this act, such pre-payment will be demanded. The clause, in the first place, directs, in general terms, payment to the dissatisfied stock-holders for their stock, the value thereof being ascertained by three commissioners ; and it then declares that such payment shall not be compelled, unless such dissatisfied stockholders shall give written notice of their dissatisfaction within three months after the lease should have been made and assented to by the requisite number of stockholders. It was argued, upon this enactment, that as the execution of the lease was to precede the payment to the stockholders who dissented, it infringed the constitutional safeguard which prevents private property being taken for public use, without being first paid for. But I think this argument is not sound. The execution of a lease would not pass any title as against dissenting corporators, until compensation should be made to them. So far as relates to such members, the execution of such an instrument would have the effect, simply, to fix a time within which their dissent would have to be expressed. The lease, although executed, could not be put into effect, nor any prop-erty delivered under it, if objected to by the non-assenting stockholders, antecedently to the payment of the assessed value of their stock. The proper remedy, therefore, of dissenting stockholders under this act would be, not to ask that the execution of a lease should be prevented, but to ask that its effect should be suspended until they had received the compensation which should be awarded to them. Until such payment should have been made, I think a court of equity would forbid all attempts to put the lease in force by a delivery of the property under it. This construction seems to me plainly the proper one, as, in this way, the act can be, in every respect, constitutionally enforced.

And it is on this account that, as I have said, if it should be conceded that the statute of the 17th of March, 1870, empowers the United Companies to lease their works to a foreign corporation, I should, if the conditions of the case now required the expression of a final opinion, have been

inclined to vote in favor of the respondents. But my embarrassment has been and is, to perceive how such a concession can be made with respect to this enactment. The act is admittedly imperfect, and such imperfection appears to me to leave the legislative intention upon the point in question, in a state of incurable obscurity. To make it readable in the sense claimed, a word having a definite meaning must be be displaced, and another word, having also a definite but different meaning, is to be substituted, and the word thus changed is the all important one in the clause, for there is but little in the context to help its interpretation. The right claimed by force, almost exclusively, of this ill-assorted term, is of the most important description. Corporate franchises of great magnitude, property of great value, in which the state itself has, in part, a proprietary interest, are authorized, it is said, to be passed under foreign control. To warrant such a conclusion, a plain expression of legislative intent should be required. This is the wholesome doctrine which should ever be rigidly enforced, for it is the only way in which we can expel from our laws ambiguous terms and obscure phrases, bearing, it may be, on an ingenious analysis, a covert signification. To give force to laws couched in unapt phraseology, and when the meaning ascribed to the language cannot rise higher in the scale of certainty than mere conjecture, is to open the door wide to all kinds of frauds upon legislation. It seems to me essential to the public welfare, that it should be understood that the courts of this state will not so interpret statutes, that incorporated companies can derive important privileges from alleged grants expressed in indistinct phrases, or in terms that in themselves convey no pertinent meaning. As against the state, these companies should be always required to present a clear title. I should find, on this account, great difficulty in concluding that the act to which I have referred, comes up to this standard.

But the view which I take of the present aspect of the case now before the court, altogether dispenses with the necessity of any conclusion upon these important matters.

They have been referred to by me in this general way, only for the purpose of helping to explain what I have now to express.

The application now made to this court is for a preliminary injunction. Nearly two years ago, a bill in chancery was filed, praying that the respondents might be prevented from executing a lease, which, it was alleged, they were then on the point of making. To that bill an answer was put in, and afterwards this matter came on to be heard before the Chancellor, and the prayer for an injunction was not granted. The proceedings, as they stood before the Chancellor, are now before this court. In short, it appears that we are apprised of the rights and interests of these parties as they existed on the 18th day of October, 1871, when the decree appealed from was rendered. The question is, whether this court ought, under these circumstances, to reverse the action of the court below, and now, at this time of day, order an injunction to issue?

In my judgment, such an application is not to be listened to. To yield to it would be to overlook the essential grounds on which the injunction power should ever be exercised. The purpose of this process is to keep things in the position in which they are at the time of the application for it, until the termination of the suit. This is the only legitimate scope of the remedy. The claim to the writ depends upon the equitable status of the parties at the crisis of applying for the aid of the court. Manifestly, therefore, the court must have knowledge of these vital facts; that is, the situation and equities of the litigants at the point of time when its authority is invoked. So, too, a plain case must be presented for its intervention. The injunction power is the strong arm of the court, and is not to be used except in cases of clear necessity.

With these principles before us, how can the court venture to grant the relief asked for? The request is to direct the Chancellor to issue the order of his court, forbidding the execution of this lease until the final hearing. Such an order will be rational, only on the assumption that such lease has not been executed. If the act to be enjoined has been done

the order of prohibition would be an absurdity ; for as a writ of injunction it could have no effect ; it would be a mere *brutum fulmen*. If, at the present moment, extrinsic facts could be regarded, each member of the court would be possessed of the knowledge that this lease has, in reality, been executed, and the property delivered under it ; and if we could look even at the statute book, we would find that the lease has been so recognized by the legislature, that the act of the ·17th of March, 1870, would, in all probability, be considered as having received a legislative interpretation. It is probable, if such information was accessible, that every vestige of uncertainty might be removed. But this court, at an antecedent stage of these proceedings, decided not to admit evidence in proof of extrinsic facts. In this rejection I did not and cannot concur. This ruling, of course, concludes the point. The matters just referred to, therefore, cannot be taken into account, and the case made upon the record before us is alone to be regarded.

Confining our view then by this narrow horizon, is the principle of action altered ? In my judgment it is not. The facts that this court is ignorant of the present position of these parties, and of the present condition of the equities existing between them, and that the act sought to be enjoined is, under the circumstances, likely to have been done, are conclusive against the exercise of the injunction power. A court never uses that power when it is blindfolded. The moment it is in the dark, it refuses to act. Among the innumerable precedents which exist, no example can be found of an injunction issuing when the situation of the parties was. in obscurity. But more than this : if we sum up the probabilities arising from the facts of the present case, as they are now developed before us, we will be led, almost irresistibly, to the result that the lease endeavored to be prohibited has already been made. The bill shows that, at the time of its exhibition, the execution of this lease was imminent. It has since then been sustained by the Court of Chancery, and no reason appears why the project should not, long ago, have.

been carried into effect. It seems undeniable, therefore, that this court is asked for an injunction which, to state it in the mildest form, is altogether likely to be utterly idle and inefficacious.

It should be observed, that the objection to this court's taking this step does not, in the remotest degree, depend upon the question whether or not this appeal has been prose-cuted with sufficient diligence. Far from this. If no laches is to be imputed to the appellants, this course of action should not, in my judgment, be adopted. The court should refuse to do the act asked for, not because any body is in fault, but because it does not seem becoming, in a judicial tribunal, to do any act which must be, there is every reason to suppose, empty and profitless. In speaking to a similar point, the Court of Errors in New York, at a time when it was distinguished by the great ability and learning of Chancellor Kent, uses this emphatic language : "There is nothing upon which the judgment of reversal can operate. To pronounce a nugatory and idle judgment, which we have not the power to enforce, is incompatible with the dignity of judicial proceedings." *Trustees of Huntington* v. *Nicoll*, 3 *Johns. R.* 578. And in the case of the *Attorney-General* v. *City of Paterson*, 1 *Stockt.* 627, Chancellor Green, perceiving, it is probable, the very great abuses to which such a power was liable, expressed the opinion, that a refusal of the Court of Chancery to grant a preliminary injunction was not appeal-able. That view, it is true, has not been received with favor, nor has the doctrine been adopted in this state ; but it seems to me that its wisdom will become remarkably conspicuous, if mandates of this character are to be issued by this court on occasions when it cannot know what their effect will be, or whether they will have any effect at all.

Nor do I think it tends to relieve the pressure of this difficulty, to say that this court must assume that affairs remain as they were when the decree in the court below was rendered. Such a proposition is a mere assumption, and a begging of the very point in debate. Why should this

court now assume, in despite of the allegations of the respondents to the contrary, that this lease has not been made? Is such an assumption an intendment *juris et de jure?* If so, in what decision has the doctrine been propounded? I know of none such, nor even of any dictum with such an aspect. And, indeed, if such a decision could be produced, I could not look upon it as either scientific or rational, because it would require the judicial mind to draw a conclusion which, from the same premises, the minds of no other class of men would be likely to draw. Given the before stated facts of this case, that many months ago, these parties were desirous of making the lease in question, and that such lease has been ratified by the Chancellor, and that no circumstance appears, showing that such parties have altered their views, and that it is now alleged before this court, by the respondents, that the lease has been made and delivered, it can hardly be doubted, that ninety-nine men in every hundred would conclude that such lease has long since been executed. On what ground is it, that this court, exercising a sober judgment, is, from this state of facts, to come to the opposite result? Men, by becoming judges, do not give up the ordinary principles of reasoning. I have used the usual standards of judgment, and have, in this way, come to the conviction that the lease in question has been made, and on this account, I cannot participate in making an order which, it is almost certain, will be a prohibition not to do that which has already been done. I am not willing to agree to the notion, that it is in any case necessary for a court of justice to listen for days to learned arguments, and to gravely consider the question whether it shall temporarily prohibit the doing of a certain act, when there is every reason to infer that such act has already been performed; when everybody else but the judges of the court, is fully aware that such act has been performed; and when the fact whether such act has been done or not, is susceptible of easy proof. Under such circumstances, an adjudication becomes a mere form, and an abstract expression of opinion. I cannot find,

that ever, heretofore, a judicial tribunal has placed itself in such an attitude.

There is also a second reason for which I think the relief which is asked on this appeal should be refused, and that is the want of proper parties to this bill.

The objection arising from this defect is substantial and not technical. The parties who have been omitted have a real interest in the suit, which will be materially affected by the operation of an injunction, if such injunction is to be at all operative. These parties who were entitled to be joined as defendants in the cause are the Philadelphia and Trenton Railroad Company, and the Pennsylvania Railroad Company. With respect to the first named company, its interest appears to be identical with that of the three companies that are made defendants. This company is one of the four companies which the bill charges were in the act of making the lease in question. It has a separate organization and independent existence, and has no such connection with the other defendants that they have or had the faintest pretence of a right to represent it in a suit of this character. The Pennsylvania Railroad Company stands upon a different ground, but it too, should, in my judgment, be a party, prior to the issuing of an injunction such as is here prayed for. This corporation is the contemplated lessee, and it appears that a contract exists, by necessary implication, between it and these other corporations that this lease shall be made. Under such circumstances, an order forbidding the performance of the contract by the execution of the demise, must be supposed to affect injuriously as well the party to which the lease is to be made as the parties who are to give it. The corporation that desires to become the lessee of these roads has to all appearance as much interest in the question whether a lease shall be allowed to be made, as have those corporations that desire to become lessors. It does not seem to me to be reasonable to deny that this Pennsylvania Railroad Company has rights which would be materially affected by the allowance of even a temporary injunction of the kind in question. On what ground is it then, that this court can be

asked to compel the Chancellor, against his judgment, to issue a writ which will very greatly and probably very injuriously operate on the interests of these absent parties.

The general principle is, that all persons who are materially interested in the object of the bill are not only proper, but necessary parties. The exceptions to this general rule are few. The rule is a cardinal one, and should be strictly enforced unless where public policy or the necessities of equity require, under a particular exigency, its temporary relinquishment. These are primary principles, and are everywhere admitted. I shall not refer to authorities in their support.

By force of these fundamental maxims of equity, then, these two companies should have been joined as defendants in this cause. The only questions are, were there any circumstances which excused their omission, and if not, what is the effect in equity of such non-joinder ?

With respect to the first point. I perceive no reason why these companies were not made defendants. It was said that the interest which must be possessed by a person to make him a necessary party to a bill, must be a legal or equitable estate. It may well be questioned whether the rule of equity is not too broadly stated in this proposition. If this statement of the rule is meant to imply that a person is not a necessary party to a proceeding in equity in any case unless he has an interest in the transaction involved in the suit which he himself could enforce, either at law or equity, I think such doctrine is manifestly erroneous. If two persons enter into a contract by parol, with respect to the sale and purchase of real estate, and which is not enforceable on account of the statute of frauds, inter sese, I should certainly hold that a third party could not go into equity to restrain the performance of such contract, without calling both the contracting parties into court; and that, in principle, is the position, taken at the strongest, of the Pennsylvania Railroad Company with respect to the lease which was in contemplation. But the question is not in reality material, inasmuch as the rule, if it exists to the effect claimed, does not embrace within its operation the

Trenton and Philadelphia Railroad Company. As this company has identical rights with those companies that are made defendants, it cannot be plausibly contended that it has no equities and that it will not be affected by the operation of the decree. I do not see anything in these suggestions, nor in the circumstances of the case, which should, on any known ground of practice, absolve these complainants from the obligation of embracing in their action these two omitted corporate bodies.

The question which results from this conclusion as to the effect of this non-joinder, is one of some nicety. I think it no answer to the objection, to say that these omitted parties might come in and pray to be admitted. As their interests are involved, their joinder to the cause before any order affecting such interests, is a legal right, and should not be made a mere matter of grace. They were entitled to be cited, and before being notified in some form, could not be required to take part in the procedure. But still, notwithstanding such is the general right of a person having an interest in the subject of the suit, I by no means desire to be understood as implying that, in a case of emergency, the Chancellor may not order an injunction, and, at the same time, direct the bill to be amended, so as to bring in the persons who have been erroneously left out. In some instances, the existence of this power is indispensable to the ends of justice. And if in the present case an injunction had been ordered, and the appropriate amendment directed, it is not probable that this court would have felt itself justified in interfering with such order, on the sole ground of the absence from the action, of those parties. Such was the rule adopted in this court in the case of *Morgan* v. *Rose,* 7 *C. E. Green* 592, in which it was said that "the non-joinder of an essential party does not, of necessity, lead to the dissolution of an injunction. The general rule is that it will have that effect, but such rule is not universal." And in that case, the injunction having been ordered in the Court of Chancery, this court refused, on appeal, to set it aside, on the ground that a party having a

technical right to be joined had been omitted. But where the injunction has been refused in the court below, a much more delicate duty, in reviewing such action, falls upon this court. When substantial parties are not joined, the question whether the Chancellor will proceed, and, by an order, affect their rights, is one which seems addressed very much to his discretion. There is no fixed and measured rule to be applied. Each case must rest on its own peculiar circumstances. It seems to me that it is only in very clear cases that this court should attempt to supervise and control the Chancellor in the exercise of this delicate duty. Is the present such a case? In my opinion it should not be so regarded by this court. I have said that these two companies, in my estimation, are necessary parties to this proceeding. I think they are obviously such. No reason appears, nor has any excuse been offered, for their omission. This defect in the bill was pointed out and insisted on in the court below. The complainants had it in their power to remove that defect, and have failed to do so. By such course these parties have been shut out from all participation in the cause. The complainants brought on an argument in the Court of Chancery, involving the entire merits of the cause, in the absence of those parties whose interests were so deeply involved. They then transferred the case to this court, and have sought here to obtain the opinion of this court on all the important legal questions which lie at the foundation of this controversy. It is impossible to close our eyes to the fact, that if the complainants should be successful in this endeavor, the cause would be completely concluded, and the rights of those non-joined corporations virtually passed upon without any opportunity for a hearing being extended to them. The entire case would be adjudged in their absence. Such a course will not harmonize with my ideas of justice or a proper administration of the law. These companies thus omitted are substantial and not technical parties, and it is their legal and equitable right to have the opportunity of putting in their answers and having their views presented for considera-

tion, before this court proceeds to pronounce an ultimate judgment on the whole law of the case, that will affect them equally with those who are here as defendants upon the record. I have given what I deem the strongest grounds for the persuasion that the lease has been made, and if this is so, and the prayer of these appellants is granted, they will have gained nothing, unless it is the abstract opinion of this court on certain legal propositions included in the controversy. Under such circumstances, as soon as they reach the court below, their first step will necessarily be to make the lessee, the Pennsylvania Railroad Company, a party to the suit. Without joining that corporation, no final decree could be given. Thus the whole matter will be thrown open again; new issues will be formed, and the new party will have the right, on appeal, to re-argue the very questions that this court is now urged to decide. It is obvious, therefore, that all that this court can now do, if these appellants are listened to, is to commit itself to certain views with respect to the case, which are to have no practical effect, and concerning which these absent parties have not been heard. Under these circumstances, it seems to me very plain that these appellants are not here in good faith asking the court to extend to them the aid of the injunction process; all they want is the opinion of this tribunal of last resort, on the important questions of law to which I have referred. Such an opinion ought not ever, if it can be avoided, to be expressed in a suit in *limine*, but should be reserved for the final hearing. Why, at this juncture in these proceedings, should this court compromit itself in regard to the legal merits of the case? Substantial parties are absent. There is great reason to believe that the only practical form in which an opinion can, at present, be put, will be profitless. Where is the necessity, or the propriety, then, for such action? I can see none.

I have not omitted to give due consideration to the form in which it is proposed to put the order of this court. As I understand it, that order is to be special, and to the effect that if the situation of the parties has changed since the

original hearing, and new issues are formed, that then the Chancellor is to proceed and determine such issues according to equity.  I am at a loss to comprehend what the operation of such an order is to be.  If it is to tell the Chancellor that in case the lease has been already made, he need not issue an injunction to forbid its being made, such a mandate from this court seems hardly necessary ; and yet I cannot suppose that it is intended to have any effect beyond this, because it seems undeniably clear that this court cannot control the action of the Court of Chancery, except on the single point of issuing or not issuing a preliminary injunction.  If the legal status of the case has changed, and that matter should be brought in due form to the knowledge of the Chancellor, and new issues should be thus formed, it would certainly seem clear that the Court of Chancery, by force of its inherent power, would deal with such matters, and that this court, on ·this appeal, can exercise no control whatever over such proceedings.  To attempt to do so seems to me to overlook the fact that the jurisdiction of this tribunal is solely appellate, and that the only question it can now respond to is, whether the injunction asked for is to be granted or refused.  The very form of this order appears to me tacitly to suggest the fundamental difficulty in dealing with this case under present circumstances ; but that difficulty cannot, as I think, be got rid of.  It is, that the action of this court is based, in point of fact, on the existence of an improbable possibility, to wit, the present non-existence of this lease.  If that lease exist, no form of decree can cover or avert the fact that a decree of reversal in this court must be blank paper.  The opinion that accompanies it, I am well satisfied, will be all that the appellants care for.  I have already given my reasons for thinking that under existing circumstances, such opinion ought not to be obtained from this court.

Nor can the question here involved be regarded by me as one of merely transient interest.  This is not to be an exceptional or isolated case.  A course of practice will be established, and that practice will be, that in every case where a prelim-

inary injunction shall be refused the complainant may appeal, and this court, rejecting all proof tending to show that the act sought to be enjoined has been done, and rejecting all inference, even the most cogent, leading to that conviction, will proceed to determine the vital legal questions of the case, and that, too, in the absence of a material and necessary party, whose non-joinder was objected to in the court below. I cannot find that such a course of procedure has ever prevailed in any appellate court, and it appears to me that if it should in the future be adhered to by this court, it will inevitably lead to inconvenience, oppression, and injustice.

As these views are not consistent with those entertained by the rest of the members of this court, I am quite conscious that the great probability is that they are unfounded in reason and in law; but as my convictions have become fixed, after full reflection, I feel conscientiously constrained to announce them. I do not wish to be understood, however, as dissenting from any of the views, on the general topic, so lucidly presented in the opinion just read by Judge Van Syckel; my objection being, exclusively, to the expression of those views in the present position of this cause.

On the grounds already set forth, I shall vote to affirm the decree of the Chancellor.

Decree reversed by the following vote:

For reversal—BEDLE, CLEMENT, DALRIMPLE, DEPUE, LATHROP, SCUDDER, VAN SYCKEL.   7.

For affirmance—BEASLEY, C. J.