ABRAHAM V. VAN FLEET AND JOHN T. BIRD, ESQS.,
VICE-CHANCELLORS.

ALFRED MILLS et al., executors &c.,

*v.*

THE CENTRAL RAILROAD COMPANY OF NEW JERSEY et al.

1. The supplement to the general railroad law (*P. L. of 1880 p. 230*), which provides that any railroad of this state may lease, consolidate or merge with any other railroad, does not authorize such lease by the directors against a minority of dissenting stockholders, so far as the latter's rights are affected thereby. That provision is merely a legislative authorization, a concession on the part of the legislature of the power to do that which could not lawfully be done without such authority.

2. The act of 1881 (*P. L. of 1881 p. 222*), which provides that railroads incorporated under the laws of this state and of adjoining states may *merge* and *consolidate* their franchises and other property, and also provides for compensation to dissenting stockholders, does not authorize a lease by one company to another.

1

Mills *v.* Central R. R. Co.

3. The supplement of 1854 to defendants' charter (*P. L. of 1854 p. 524*), which provides that the defendants may purchase, lease or operate any railroad connecting with their own road, with a provision protecting the rights of dissenting stockholders, does not authorize the defendants to lease *their* road to another company.

4. The sixth section of the general corporation act (*Rev. p. 178*), which provides that the charter of every corporation thereafter granted shall be subject to alteration, suspension or repeal, in the discretion of the legislature, does not incorporate the act of 1880, *supra,* in defendants' charter so as to affect injuriously the vested rights of stockholders.

5. One of two trustees who held stock of the defendants, as part of their trust funds, merely expressed an opinion favorable to the lease of the defendants' road to another, but refused to vote for a resolution by the stockholders directing the officers to make the lease, and afterwards voted against ratifying it—*Held,* that he was not estopped by acquiescence from assailing its validity.

6. The lessee of a railroad took possession thereof on May 29th. The complainants filed their bill to annul the lease on August 29th following.—*Held,* that they were not barred by laches from maintaining their suit.

7. Whether the lease was a judicious and profitable arrangement both for defendants and complainants, or whether the lessee has become insolvent since the lease was made, cannot control or affect complainants' rights in the premises.

8. Where there is no legislative authority for ascertaining the damage inflicted upon dissenting stockholders by the majority diverting their vested rights by an illegal lease, and for awarding them compensation therefor, the court will not assume that function, but will annul the lease and restore complainants to their position before those rights were invaded, regardless of the effect of such action upon the lessee.

Bill for relief. On final hearing on pleadings and proofs.

*Mr. H. C. Pitney* and *Mr. B. Gummere,* for complainants.

*Mr. B. Williamson, Mr. Kaercher,* of Philadelphia, and *Mr. G. M. Robeson,* for defendants.

THE CHANCELLOR.

This suit is brought by Alfred Mills and John H. Lidgerwood, executors of the will of Stephen Vail, deceased, against the Central Railroad Company of New Jersey, the Philadelphia and Reading Railroad Company, and the persons who, at the time of filing the bill (August 29th, 1883), were the directors of the

Mills v. Central R. R. Co.

latter company.   The object of it is to annul a lease made May 29th, 1883, by the Central to the Reading, by which the former demised to the latter for the term of nine hundred and ninety-nine years, its railroads and works and all their appendages and appurtenances, and conveyed to it all its property and assets, real and personal, together with all its rights, powers, franchises and privileges for the management, maintenance, renewal, extension, alteration or improvement of the demised railroads and works and their appurtenances.   The rent reserved was payments of interest, dividends, rents &c., for which the Central was liable, and the annual payment of a sum equal to six per cent. upon the par value of the then outstanding capital stock of that company.   The Reading took possession of the property at the date of the lease.   The complainants now hold, and did at the date of the lease, two thousand and forty-eight shares of the stock of the Central.   They never consented to the lease, and they insist that they are entitled in equity to have it set aside and to have the Central re-instated in the rights and repossessed of the property which was demised or conveyed by that instrument.

The questions to be considered are whether the Central had the right to make the lease without the consent of the complainants ; and if not, whether the latter are estopped by their conduct in reference to it from seeking relief in equity against it.

The Central has undertaken to transfer to the Reading all of its railroads and other works, with all of its franchises requisite to maintaining and operating them, for a period so long as to be equivalent in duration to a conveyance in fee, and it has conveyed to the Reading all the rest of its property, real and personal.   It has thus, if the lease be valid, divested itself of all of its property, and, abdicating all control of its railroads and other works, turned over (practically forever) the management and operation thereof to the Reading, only reserving to itself the payment of the rent with the right of enforcing it by re-entry &c., and the benefit of certain covenants.

The lease was made with the consent of a majority only of the stockholders of the Central.   It is urged by the defendants that when it was made the Central had legislative authority so

to make it, derived not only under the supplement of 1880 (*P. L. of 1880 p. 231*) to the general railroad law, but also under the third section of a supplement to its charter, which supplement was approved March 17th, 1854, (*P. L. of 1854 p. 524*), and under the act of 1881 "to authorize railroad companies, incorporated under the laws of this and adjoining states, to merge and consolidate their corporate franchises and other property." *P. L. of 1881 p. 222.* The act of 1880 declares, among other things, that it shall be lawful for any corporation incorporated under the general railroad act or under any of the laws of this state, at any time during the continuance of its charter, to lease its road, or any part thereof, to any other corporation or corporations of this or any other state, or to unite and consolidate as well as merge its stock, property and franchises and road with those of any other company or companies of this or any other state, or to do both ; and such other company and companies are thereby authorized to take such lease or to unite and consolidate as well as merge its or their stock, property, franchises and road with such company of this state, or to do both &c. The supplement imposes no condition that the stockholders or any of them shall consent, but is silent on that head. The provision in that act that it shall be lawful to lease or consolidate, is merely a legislative authorization—a concession on the part of the legislature of the power to do that which could not lawfully be done without such authority. It is not an enactment that the directors may, without the consent of the stockholders of the company, lease, consolidate or merge. Nor is it, in effect, an enactment that they may, with the consent of the majority of the stockholders, do so. But the statute is merely an enabling act—a law intended to give, once for all, a general legislative authority to lease, consolidate or merge. The legislature did not intend to affect the rights of stockholders *inter sese*, and the act does not do so, either expressly or by implication. It was settled law when the act was passed that after shareholders had entered into a contract among themselves under legislative sanction and expended their money in the execution of the plan mutually agreed upon, the plan could not, even by virtue of legis-

lative enactment, be radically changed by the majority alone, and dissentient stockholders be compelled to engage in a new and totally different undertaking, because such action would impair the obligation of the dissenting stockholders' contract with their associates and the state. This was declared, by the highest tribunal of the state, to be the law, and to be as well supported by every consideration of justice and right as it was firmly imbedded in judicial decision. *Black* v. *Del. & Rar. Can. Co., 9 C. E. Gr. 455.*

The rights of unwilling stockholders are not protected by the act of 1880, and inasmuch as their interests cannot be taken or controlled *in invitum,* except under the exercise of the right of eminent domain, it is a legal conclusion, from the absence of any provision in that respect, that the legislature did not intend to exercise the right of eminent domain at all, but simply to confer the right to do the act or exercise the power given on first obtaining the consent of those affected or on payment of satisfactory compensation to such, outside of legislative provisions. *Carson* v. *Coleman, 3 Stock. 106 ; Boston &c. R. R.* v. *Salem &c. R. R., 2 Gray 1 ; Mills on Em. Dom.* § *128.* Where a railroad company, by a vote of a majority of the stockholders, but without legislative authority, leased its road to another, it was held that the transaction was not valid as against the minority, although the legislature subsequently ratified and confirmed it. *Boston &c. R. R. Corp.* v. *N. Y. & N. E. R. R. Co., 2 Am. & Eng. R. R. Cas. 300.*

. The act of 1881, to which reference has been made, is one "authorizing railroad companies incorporated under the laws of this and adjoining states, to merge and consolidate their corporate franchises and other property." It provides for the consolidation and merger of companies whose railroads form a continuous line. But the law of 1880 had already declared that railroad companies might consolidate and merge their stock, property and franchises. The law of 1881 provides the method of consolidating or merging in the cases which are within its provisions. It makes it necessary that two-thirds of the stockholders of each company shall agree to the change. It is not in terms amenda-

tory of the general railroad law, and it makes no reference to the act of 1880. It is in itself some evidence that the legislature intended, by the act of 1880, to do no more than give its consent to leasing, consolidation or merger. The act of 1881 provides that stockholders refusing to agree to the consolidation may have their damages assessed and their stock appraised, and that the company shall pay the damages or take the stock at the appraised value, and that, if the value of the stock be not paid within the time limited in the act, the amount of the damages shall be a judgment against the company. The act gives no express power to lease.

But it is argued that the power to consolidate either involves in itself the power to lease or so enlarges the power given by the charter to purchase, hold and convey any lands, tenements, goods and chattels whatsoever, necessary or expedient for the objects of the incorporation (*P. L. of 1847 p. 128*), as to create the authority to lease. In *Branch* v. *Jesup, 106 U. S. 468,* where a railroad company had power by its charter to incorporate its stock with that of any other railroad company, and had also by the charter the ordinary power to purchase, hold and convey property, real and personal, it was held that the power to incorporate the stock had such an enlarging effect upon the power to sell as to authorize a sale of the railroad and franchises of the company to another railroad company, which issued its stock in the place of that of the selling company to the holders of the latter stock. The stock so issued was accepted by those stockholders and they all fully acquiesced in the arrangement. The selling company constructed its road under an agreement with the purchasing company, by which the road was to be constructed in sections, and the sections, as they were constructed, were to be turned over to the latter company, and, after the completion of the road, the stock of the former company was to be incorporated with that of the latter. The case supports the proposition that a railroad company having the ordinary power to buy and sell property, with power to incorporate its stock with that of any other railroad company, may, under those powers, lawfully sell all its property and franchises to a railroad

Mills v. Central R. R. Co.

company with whose stock it incorporates its own. But I am of opinion that power to consolidate does not involve authority to lease, and that it does not enlarge the power to convey lands &c. conferred by the charter. Power to consolidate is power to take in a partner or to go in as a partner, while power to lease is power to dispose of the whole concern to a stranger. In a consolidation the stockholders of the respective companies still retain, to a certain extent, control of their corporate property, but, by a lease, the stockholders of the leasing company part with the control of their corporate property and hand it over to others and abandon their enterprise. In *Archer* v. *Terre Haute &c. R. R. Co.*, *7 Am. & Eng. R. R. Cas. 249*, it was held that the grant of power to consolidate does not involve within it power to lease. The act of 1881 did not authorize the making of the lease.

Nor was it authorized by the third section of the supplement of 1854 to the charter of the Central. That section declares that it shall be lawful for the company to purchase or lease or operate any railroad which may connect with or intersect its road, or to guarantee the bonds of such company, or to consolidate the stock of such company with its own on terms to be mutually agreed upon; but it provides that such purchase or consolidation shall not be made without the assent of three-quarters in interest of the stockholders, and that if any stockholder or stockholders shall refuse his or their assent, or if, by reason of absence or legal inability, such assent cannot be obtained, application may be made by such stockholder or stockholders, within three months from the time that the purchase or consolidation shall take effect, to one of the justices of the supreme court of this state for the appointment of commissioners to appraise the value of the shares of such stockholder or stockholders—the appraisement not to be less than par; and that thereupon such proceedings shall be had as provided in the charter for condemning lands, so far as they may be applicable. Obviously, that section did not authorize the lease.

The defendants insist that the charter of the Central, having been granted after the passage of the general corporation law

(*Rev. p. 178*), by the sixth section of which it is provided that the charter of every corporation which shall, thereafter, be granted by or created under any of the acts of the legislature, shall be subject to alteration, suspension and repeal in the discretion of the legislature, the provision of the act of 1880 in regard to leasing &c. is to be regarded as incorporated in the charter itself; and that, if so, that act authorized the company to make the lease, and the directors, acting for the company and being its duly constituted agents, could lawfully and effectually (especially with the assent of a majority of the stockholders) execute the power.

But, notwithstanding that provision of the general corporation law, subsequent legislation prejudicial to the vested rights of stockholders, as between themselves, is not, so far as such rights are concerned, to be regarded as having constructively existed from the passage of the charter, and is invalid. *Zabriskie* v. *Hackensack & N. Y. R. R. Co., 3 C. E. Gr. 178.* In that case, referring to the above-mentioned provision for alteration, amendment or repeal, and to a like one in the charter of the company itself, the chancellor said that the object and purpose of that provision were so plain, and so plainly expressed in the words, that it seemed strange that any doubt should be raised concerning them; that the provision was a reservation to the state for the benefit of the public, to be exercised by the state only; that the state was making what had been decided to be a contract, and it reserved the power of change by altering, modifying, or repealing the contract; and that neither the words nor the circumstances, nor the apparent objects for which the provision was made could, by any fair construction, extend it to giving a power to one part of the corporators as against the other, which they did not have before.

Mr. Wood, in his treatise on Railway Law, says that under a reservation of authority to alter, amend or repeal a charter, the legislature does not acquire unlimited power over a corporation to make alterations in the charter which impair its vested rights, and that such reservation does not sanction a reckless invasion

of rights of property or an interference with contract obligations. *1 Wood Rail. L.* § *39*.

The complainants are entitled to relief in equity unless by acquiescence they are estopped from claiming it, or by their laches have lost their right to it. There is no evidence of acquiescence. On the contrary, there is clear proof of a refusal to consent to the making of the lease. It appears that of the two executors, Mr. Mills alone attended to this business. He alone voted upon the stock for directors, examined the proposed lease, and attended the meeting called to ratify it. Mr. Lidgerwood, the other executor, seems to have taken no part in the matter. The evidence upon the subject of acquiescence is, according to the testimony of the president of the Central, that, prior to the meeting of the stockholders of the Central which took place May 11th, 1883, at which directors were chosen and a resolution was adopted in favor of a lease to the Reading, Mr. Mills, on two or three occasions, in conversation with him, led him to suppose that he was in favor of a lease to the Reading at a rental of six per cent. upon the stock of the Central, Mr. Mills saying that he thought it was the best thing the president could do ; that on the 11th of May, on his way to the stockholders' meeting, he again said, in conversation with the president upon the subject, that he thought it would be wise to execute the lease—the best they could do for the interest of the stockholders—but on that occasion he added that he was in such a position (as executor) that he would not vote for it himself, because the directions of his testator's will were that the property should not be sold, and he thought that a lease for nine hundred and ninety-nine years was so nearly a sale that he, as trustee, did not think it would be well for him to be a party to it. The president says that Mr. Mills gave that as his reason for not voting for the lease. Mr. Mills, at that meeting, voted for persons for directors who were understood to be in favor of making the lease, but he did not vote for the resolution (which was then adopted by a majority vote) in favor of a lease. That resolution was that the stockholders approved of the proposed lease and contract to and with the Philadelphia and Reading Railroad Company, and

requested the directors to execute and carry the same into effect immediately upon the company acquiring the legal power to act in the premises by the termination of the receivership. The president of the Central had reported to the meeting that a proposition had been made by the Reading to lease and acquire the property of the Central, under a lease and contract for nine hundred and ninety-nine years, which would guarantee six per cent. dividends to the stockholders of the Central, commencing to run from September 1st, 1883, the first quarterly dividend to be payable on December 1st, 1883, and that the board of directors were of opinion, subject to the proper ratification by the stockholders, that, after the termination of the receivership and upon the company's obtaining legal power to act in the matter, such lease and contract should be made. That was the proposal referred to in the resolution. Mr. Mills neither voted for nor against the resolution. Between the meeting of the 11th of May and a stockholders' meeting held upon the 6th of July following, to ratify the lease, Mr. Mills called at the office of the Central and read a draft or copy of the lease. On the latter day he met the president of the Central on their way to the meeting, and he then said to the president that he, Mr. Mills, owed it to the president to say that he should that day vote against the lease— against its ratification; to which the president replied that he was sorry for that, and Mr. Mills then said that in his position as trustee he thought it was the best thing for him to do. The president says he thinks Mr. Mills added that he had taken counsel about it. The president further testifies that Mr. Mills expressed no objection to the lease or its terms upon that occasion. Mr. Mills says that he did not, on the day of the stockholders' meeting in May, express an opinion that leasing the road to the Reading would be the best thing that could be done for the interest of the stockholders. He says that he was anxious that the road should be put in a good position, and was favorable to anything that would effect that end, but was not sufficiently familiar with the terms which were to be inserted in the proposed lease to express such an opinion. According to the testimony of the president, while on the 11th of May and prior

thereto Mr. Mills expressed opinions in favor of a lease, he, on that occasion, expressly refused to vote for a lease, and on the 6th of July declared that he felt bound to vote against the lease which was then to be submitted for ratification. He did not vote for the resolution at the meeting of May, and he voted against the lease at the meeting of July. According to the evidence, he at most expressed an opinion in favor of leasing, but never voted in favor of any lease. On the contrary, he refused to vote in favor even of the policy of leasing, and when the lease in question was submitted for ratification, he voted against it. He had no interest, except as trustee, and it was understood that he was acting in the matter merely in a trust capacity. At the meeting of the 11th of May, he said, according to the president's testimony, that in view of the obligations of his trust upon him he did not think it would be well for him to be a party to the making of the lease, and therefore he would not vote for it. He manifestly intended to be understood as not acquiescing, and in fact he was so understood. According to the testimony on the part of the defendants, what he said was that he thought it would probably be the best policy to lease, yet he would not consent that that policy should be adopted, nor was there anything in this conduct to mislead the defendants, and they were not misled by it. They acted on the assumption that the lease was valid if ratified by only a majority of the stockholders. The lease had not been drawn when the meeting of May was held. The only terms then suggested for it were the lease and transfer of the property on the one hand, and the payment of the rent on the other. Afterwards, and it appears to have been about the 26th of May, the terms of the lease were settled upon by the directors of the companies, and it was executed on the 29th of that month, and at that date the Reading took possession of the property. The call for the meeting of stockholders to ratify the lease was dated June 14th, so that the lease had been executed and the lessee was in possession under it two weeks before that call was issued and over a month before the stockholders' meeting for ratification was held.

Nor are the complainants barred by laches. This suit was

begun on the 29th of August, less than two months from the meeting of July. As before stated, the lessee took possession on the 29th of May. The Lehigh and Susquehanna railroad, which the Central held under lease when the lease to the Reading was made, passed into the hands of the Reading, with the consent of the Central, on the 29th of May, the date of the lease in question in this suit. Whatever was done by the Reading on the strength of the lease was done in confidence of the validity thereof, notwithstanding the refusal of some of the stockholders of the Central to ratify or acquiesce. If a stockholder, in order to save his rights in such a case as this, is bound to bring suit, a delay of fifty-four days in bringing it is not, under such circumstances as this case presents, laches. Sixty days is the time given by the statute for filing an answer to a bill, and surely he may, without forfeiting his rights, take as much time to prepare his bill as the defendants would have by law to put in their answer. If a stockholder whose rights are disregarded and trampled under foot makes reasonable haste to bring suit, it is enough. It is to be remembered that he is the injured party, and there is some hardship, to say the very least of it, in requiring him to incur the expense and trouble of a suit to protect his rights against unwarrantable and reckless invasion. It certainly cannot be regarded as being the law that he is to lose his rights unless he brings suit immediately to recover or protect them. If such were the law, minorities of stockholders would often fare very badly indeed. The Reading, in assuming that the assent of the majority of the stockholders of the Central was enough to validate the lease, accepted the hazard of its own subsequent actions based upon that assumption.

It is urged that to set aside the lease will be injurious, not only to the majority of the stockholders of the Central and to the Reading, but also to the complainants themselves, and to establish this the defendants have undertaken to show that the lease was a profitable and most desirable arrangement for the Central. This might be conceded, and yet the complainants would be entitled to the relief which they seek. When the lease was made the Central had been declared and decreed by this court to be

solvent and its affairs had been remitted to its hands accordingly. It must therefore be held to have been a solvent corporation. It is a matter of public notoriety that the Reading has, since the making of the lease, become insolvent. These considerations, however, cannot control or affect the complainants' right to have the trust property restored to the uses to which, by the contract between them and their fellow-stockholders, it was devoted. Again, this appeal to the court not to disturb the existing arrangement is an appeal in behalf of the wrong-doers themselves, those by whose action the injury has been done to the complainants.

It is urged that if this court finds that the lease is invalid because it is an infraction of the complainants' rights, it will merely decree payment to the complainants of the value of their stock, to be ascertained here. There are many cases in which, where a corporation authorized to take property by the exercise of the right of eminent domain, takes it without making compensation, but under circumstances entitling it to the consideration and protection of equity, this court will refuse to disturb its possession or to permit it to be disturbed, provided due compensation, to be fixed by this court, be made. But to take that course in this case would, in fact, be to condemn the complainants' stock (for which this court has no warrant), and that, too, in the interest and for the protection of those who are without any claim to equitable interference. It is for the legislature to say whether the stock of dissenting stockholders shall be taken as for a public use under the exercise of the right of eminent domain. It has not said that it may be so taken in this case. Those who, in such a matter as this, act without the acquiescence of all the stockholders, do so at their peril, and must take the consequences if their act be undone at the instance of dissentient stockholders. It may be added that celerity in effecting their design and activity in accumulating obstacles to granting relief will not secure to them immunity and prevent this court from upholding the rights of the injured. There will be a decree declaring the lease null and void and the transfer of property thereby made, illegal.