FARMERS LOAN AND TRUST COMPANY et al.

*v.*

ERSKINE HEWITT et al.

[Submitted May 5th, 1922. Decided June 2d, 1922.]

1. Whether iron mines owned by a corporation shall be operated at a loss during a business depression, or closed down at a smaller loss, is a purely business and economic problem to be determined by the directors and not by the court, and the judgment of the majority must prevail in the absence of bad faith or abuse of power.

2. Under a will bequeathing a large estate to a corporation organized by the testatrix, and bequeathing stock therein to her children, they hold the stock with all the privileges, powers and obligations granted to or imposed upon stockholders by law.

3. Whether a corporation, owning assets of large value and having readily salable securities in the treasury, but in need of funds, shall obtain them by issuing bonds or by selling such securities, is a matter to be decided exclusively by the board of directors, and equity cannot review its decision.

4. Whether a corporation in need of funds should raise them by issuance of bonds convertible into stock, or by bond and mortgage, or by borrowing on the company's personal credit is also a matter to be determined by the directors.

5. A proposed issue of corporate bonds convertible into stock to be offered to the stockholders in proportion to their holdings, will not be enjoined, though stockholders failing to respond will suffer tremendous loss by depreciation in the value of their stock, all stockholders being dealt with alike.

6. Where a corporation issues bonds convertible into stock and offers them to the stockholders in proportion to their holdings of stock, the purchase of such bonds by trustees owning stock to protect the trust estates is not an investment within the terms of 2 *Comp. Stat.* p. 2271, especially where they have received a dividend in excess of the forced loan under an agreement that they will lend the company their share of any sum needed from time to time as additional working capital.

7. In a suit to enjoin directors from submitting to stockholders the question of issuing bonds convertible into stock to be offered to the stockholders proportionately, evidence *held* insufficient to show that the proposed bond issue was in bad faith, for the purpose of confiscating the stock holdings of minority stockholders.

8. A proposed corporate bond issue will not be enjoined at the suit of minority stockholders as too large where the bonds are to be issued in amounts necessary to meet the company's requirements, since, if the demands become excessive, relief may then be applied for.

On bill for injunction, &c.

*Mr. Merritt Lane,* for the complainants.

*Messrs. McCarter & English (Mr. Conover English),* for the defendants.

BACKES, V. C.

This is a stockholders' bill to restrain corporate action, and the motion is for a preliminary injunction.

The Ringwood Company was formed in 1905 by Mrs. Sarah A. Hewitt, widow of Abraham S. Hewitt, for the more convenient management of her vast estate in the town of Ringwood and vicinity, in the Greenwood lake section of the state, and for the accommodation of her testamentary disposition. The capital stock is $6,000, divided into six hundred shares, par $10. Mrs. Hewitt conveyed to the corporation her lands in this state and also stocks and securities of other corporations. She died in 1921, and by her last will and

testament devised and bequeathed to the company all her estate not therein otherwise disposed of, and then bequeathed to each of her six children one-sixth, or one hundred shares, of the capital stock of the comany—to five of them outright, and to one, Edward R. Hewitt, in trust, for his life, with remainder to his issue. As a result of an agreement entered into by the children, in October following, the will was admitted to probate; stocks and securities bequeathed to the children by their mother were transferred to the company; the directors were increased from three to six, and each child's interest was given a representation on the board. The company's assets at that time were estimated at $9,000,000. In November following, the company divided a million and a half of securities among the children, and the following April another million and a half of stocks and securities was distributed. In the latter month the company assumed all the obligations of the estate of Mrs. Hewitt, and her executors were discharged. Peter Cooper Hewitt, one of the sons, died in August, 1921, and the Farmers Loan and Trust Company of New York, one of the complainants, is executor and trustee of his will. The principal activities of the company have been the development of the lands for residential purposes, and the operation of iron ore mines at Ringwood. The land improvement enterprise is progressing slowly, but the mines are at a standstill, owing to the present depression in the iron trade. The management has been, and is, in the hands of Mr. Erskine Hewitt, and a division of opinion has arisen between him and his three sisters, who, or whose representatives, form a majority of the directors, and the complainants, representing the estate of Edward R. Hewitt and Peter Cooper Hewitt, as to whether the mines should be shut down and flooded, at a resumption cost of $100,000, or be operated on a small scale, and ready-for-business basis when trade revives, at an expense of from $150,000 to $300,000 a year. The majority of the board is of the opinion that the latter course should be pursued, but, whichever may be adopted, the company stands in need of funds to carry on, and to that end the board of directors, on March 9th, 1922,

passed the following resolution by a vote of four to two, the complainants voting in the negative.

"*Resolved*, That the board of directors deems and declares it advisable that the company be authorized to issue bonds to an amount not to exceed five hundred and ninety-four thousand dollars ($594,-000) to become due not less than three years nor later than five years from the date of issue, to be redeemable at the option of the company as a whole, but not in part at any time upon thirty days' notice as hereinafter provided, and to bear interest payable semi-annually at a rate not less than six per cent. (6%) nor more than eight per cent. (8%) which bonds, as shall be therein so declared and prescribed shall unless redeemed prior to the expiration of two years from the issue thereof, be convertible at par at the option of the holder into fully paid common stock of the company at par at any time after the expiration of the said two years and before the fixed date for the maturity thereof or before their earlier redemption after the expiration of the said two years; in case of the exercise by the company of its option to redeem the said bonds before their maturity, notice thereof and of the date fixed for such redemption to be mailed to the last-known address of each holder of said bonds, as it may appear on the books of the company, not less than thirty days prior to said date. Said bonds to be offered to the stockholders *pro rata* in such multiples of $6.000 and at such times as may be required for the proper financing of the company as determined by the officers of the company, and any bonds so offered and not taken to be offered to subscribing stockholders in proportion to the amount of their subscriptions: any bonds not so taken to be sold on such terms and to such purchasers as to the officers shall seem fit, the conditions as to the time within which subscriptions must be made for the said bonds, the denominations thereof and other details to be determined by the officers.

"*Resolved*, That the board of directors deems and declares it advisable that the total authorized capital stock of the company be increased from six thousand dollars ($6,000), divided into six hundred shares of the par value of $10 each to six hundred thousand dollars ($600,000), divided into sixty thousand (60,000) shares of the par value of ten dollars ($10) each, all of which shall be common stock; and that the certificate of incorporation be amended by amending article fourth thereof to read as follows:

"*Fourth*. The total authorized capital stock of this corporation is six hundred thousand dollars ($600,000), divided into sixty thousand (60.000) shares of the par value of ten dollars ($10) each, all of which is common stock."

It was further resolved to submit the resolutions to the stockholders at a special meeting to be held March 14th, then following, for their consideration and approval. Thereupon

this bill was filed by the two dissenting directors and a temporary restraint issued.

The prayer of the bill is twofold, to restrain the operation of the mines during the pending business depression, because wasteful, and to prevent the raising of money by the plan indicated by the resolutions, on the grounds that it is unconscionably oppressive, confiscatory of the complainants' capital interest in the corporation, and that it was conceived in bad faith by the majority stockholders with intent to deprive the minority of its holdings.

Whether the iron mines should be operated at a loss or closed down at a loss, but less, are purely business and economic problems to be handled by the directors, not by the court, and the majority judgment must prevail, in the absence of a showing of bad faith or abuse of power. *Ellerman* v. *Chicago Junction Railroad Co., 49 N. J. Eq. 217.* It is to be assumed that the defendants, representing, as they do, four-sixths as against the complainants' two-sixths interest, will pursue a course that will best serve the interests of the company. Self-preservation alone would deter them from doing otherwise.

Statutory authority for raising the funds by bonds convertible into stock, as undertaken by the directors, is conceded, and that the procedure is in all respects in conformity with sections 27 and 29a of the Corporation act is not disputed, but the complainants set up a variety of reasons why the court should intervene.

They say that the scheme proposed will do violence to the intention of Mrs. Hewitt's will. All that need be said on that score is that her testamentary wishes ended with her bequests of the capital stock of the company equally among her children. They were, thence, to hold and enjoy the gifts, with all the powers and privileges and obligations granted to and imposed upon stockholders by the laws governing corporations —nothing else is signified.

They next contend that the bond issue—the result of which will be the pledging of their stock—is an unwarrantable exercise of power, and unjustifiable, because the company has

in its treasury securities of other corporations of the value of $700,000, which could be readily sold. The answer made to this is that the company owes over $500,000, and that some of these securities are already pledged for a loan of $200,000; that when the company resumes mining operations, large sums will be required, and they should be kept to borrow on if that should become necessary.; that borrowing in a tight market on personal credit, no matter how high the financial standing of the borrower may be, is not as feasible as on securities, and that in the opinion of the majority it is inadvisable to strip the treasury of these quick assets, and that sound business policy dictates that they be kept as a reserve for such an emergeny. I see no reason to disagree with them. When it is considered that the company's fabulous wealth is, for the most part, potential, and how swiftly disaster may overtake and crumble it, if funds are not promptly available, the wisdom of the action of the directors is at once apparent. However, the decision lies exclusively with the board; equity cannot review it.

They suggest that the money be raised by bond and mortgage on the lands of the company. This method, if adopted, would, in the opinion of the majority of the directors, be suicidal. This gloomy view is the privilege of the directors. Their further suggestion that the company borrow the money on its personal credit is likewise a matter for the directors' consideration.

Their next point is that the proposed bond issue means, practically, the confiscation of their stock. It does mean the pledging of their stock, and, in effect, compelling them to contribute their proportion of the proposed loan, but I am not in sympathy with their pessimistic frame of mind, and hopeless attitude, that there will be a depletion of their capital interest. All the stockholders are to be dealt with alike. There is to be an equal apportionment of the bonds. There is to be no inequality in the burdens to be borne or advantages to be gained. It is true that if any of the stockholders fail to respond they will suffer tremendous loss in depreciation of the value of their stock, but their loss will be

of their own making. *Berger* v. *U. S. Steel Corp., 63 N. J. Eq. 809.*

Their claim that they will be embarrassed in taking their allotments of the bonds, because the bonds are not securities in which they may invest (*Comp. Stat. p. 2271*), is inadmissible. The will of Peter Cooper Hewitt gives express authority to do so. The trustees of Edward R. Hewitt's estate have the power by implication, at least. Mrs. Hewitt's will is not part of the record and I make this deduction from an excerpt contained in one of the affidavits. However that may be, I am of the opinion that the present call upon the trustees is not an investment within the meaning of the act. The mandate respecting investments by executors and trustees in certain securities must be read in connection with the Corporation act, which authorizes the present imposition upon executors and trustees if they be stockholders. In responding the trustees are not investing but protecting their estates. That the money is to be raised by bonds, and the transaction assumes the appearance of a loan by the stockholders to the corporation, does not argue that the bonds are an investment. The company could have accomplished the same thing by increasing its capital stock; and then would not they be derelict in their duty to their trust if they failed to subscribe proportionately? The bonds are merely an added link in the chain of liability, to afford an opportunity for redemption, before conversion, if the company should come into funds. The trustees are surely not without funds, and will not be embarrassed in that respect, as they insinuate, for in 1912 and 1913 they, or those they represent, each received in the neighborhood of $500,000 in marketable securities, as already told. Moreover, I can see no hardship in the directors exacting from them the forced loans in view of an agreement made by the children with the company, between the payments of the first and second dividends in 1912 and 1913, and, unquestionably, in consideration of such payments, that if and when called upon they would each "from time to time lend to the Ringwood Company, on demand, one-sixth of whatever sum may be deemed from time to time necessary

by the officers of the company as additional working capital, provided that the total amount to be loaned by each stockholder shall not exceed in all the sum of one hundred thousand dollars ($100,000), nor at any time the total of the cash dividends which shall, since the 14th day of August, 1912, have been paid upon the stock now owned by him (or in the case of Edward R. Hewitt, by his trustee)." The "cash dividend" undoubtedly refer to the division of the securities. The stockholders are simply being called upon to redeem their promises.

And now as to the charge of bad faith in the scheme to raise funds by the convertible bonds plan. It is far-fetched. It is based on declarations alleged to have been made by Erskine Hewitt to Edward R. Hewitt—"that he was going to compel the Farmers Loan and Trust Company * * * to sell out * * * at a low figure"—and to Mrs. Edward R. Hewitt, "that he would make it so troublesome for the Farmers Loan and Trust Company, and so expensive, that they would consider it the best solution of the matter to sell the holdings in the Ringwood Company at a very reasonable rate," the implication being that he would "freeze out" the Peter Cooper Hewitt interest; and on two paragraphs in a letter to the Farmers Loan and Trust Company, November 29th, 1921, as follows:

"If the estate of Mr. Peter Cooper Hewitt did not subscribe to the capital stock increase, it would result in a serious diminution of its proportional interest in the capital stock of the company, the capital stock being so small."

And,

"To my mind the only sufferers of the conversion of the debt into stock would be the two trusts involved, and it is because of this that they have refrained heretofore in order not to injuriously affect the Edward R. Hewitt trust."

The context proves clearly that the letter has no bearing whatever upon the subject to which it is now sought to be applied. When Mrs. Hewitt formed the Ringwood Company

she also formed the Hewitt Realty Company to hold her real estate in New York, Bar Harbor and elsewhere, all of great value. The capital, like that of the Ringwood Company, was nominal and the stock was divided equally among her children, by her will. The children, including Peter Cooper Hewitt, from time to time, had loaned the Ringwood Company and the Hewitt company large sums of money, and at the time of writing the letter the trustees of Peter Cooper Hewitt's estate were pressing for payment, and to dissuade them from suing, Mr. Hewitt wrote that "there are only two ways in which these [the loans] could be met at the present time, namely, by an increase of the capital stock of the company or by a sale of some or all of the respective companies' property;" and sounded the warning that "coincident with the calling of your loans, the loans of the other stockholders will also be called," and that "these in four instances are greater than the loan of Mr. Peter Cooper Hewitt, and would result, if such action were taken, I believe, in serious loss to the capital interest." Manifestly, the resort to the letter, to bolster up the charge of fraud, is nothing short of perversion. And so as to the declarations attributed to Mr. Hewitt by Edward R. Hewitt and his wife: They were used by him in a sense, and to express a sentiment, so alien to the motive now ascribed to them, that I cannot escape the belief that they were unworthily seized upon and molded to suit the present exigency. Their then understanding of his attitude was certainly not as they now choose to interpret and convert his words. What was said by Erskine Hewitt occurred at an interview brought about by Mrs. Edward R. Hewitt. It was when the Farmers Loan and Trust Company was urging the payment of its loans, and at the same time prospecting for the sale of its stock to the Ringwood Company, Erskine Hewitt had been approached, and his version of what he said, in substance, as he says, was: "That the situation or the circumstances would make the trust company wish to dispose of their stock even at a low price;" and he avows he "still believes this to be a correct

forecast." He denies entertaining any thought or intention of compulsion or pressure to compel the trust company to sell or expectation on his part to buy. Indeed, Mrs. Hewitt absolves him of coveting the stock, for she says that he said he was not interested, and he suggested that her husband and his sister might very profitably buy it in, as in his opinion it would, in the course of years, increase in value. The theme was so absolutely incompatible with the thought of a bond issue, or the like, as a compelling medium, in view of the obvious fact that the burden of meeting its demands would be as onerous and inimical to the interests of the Edward R. Hewitt estate, in which Mrs. Hewitt was vitally concerned, as to the Peter Cooper Hewitt trust, that subtle ingenuity alone could possibly force a connection between the two. Moreover, the charge of bad faith is utterly exploded, it seems to me, by the further fact that the proposed scheme, by the proportional allotment of the bonds to each of the stockholders, bars any possibility of overreaching. The complainants, like the other stockholders, have nothing to fear, for they will be immune from danger of loss if they meet their lawful obligation to the company.

The complaint that the bond issue is too large is not pertinent at this time. The bonds are to be issued in amounts as may be necessary to meet the requirements of the company, and if the demands should become excessive, and, hence, oppressive, relief may then be applied for.

The existing restraint will be dissolved and an injunction *pendente lite* denied.