The East Orange bank and the Central Trust Company, of East Orange, entered into an agreement with the Savings Investment and Trust Company of East Orange, by a two-third vote of all the members of their respective boards of directors, to merge into the Savings Investment and Trust Company the five thousand shares of capital stock of the former, each having twenty-five hundred shares, to be exchanged for a like number of shares of the savings investment company. Stockholders of eighty-five per cent. of the ten thousand shares of the savings investment company voted their approval of the merger. The approval vote of the stockholders of the two other companies was, approximately, of the same percentage. The complainants, holders of one hundred and ninety-six shares of the savings investment company, alone voted disapproval, and filed this bill to enjoin the merger, setting up that the agreement is ultra vires the savings investment company, and, if authorized, that the plan is unfair and inequitable.
The savings investment company was organized in 1890 under the Safe Deposit and Trust Company act of 1885. It took its charter subject to the reservations contained in the act of 1846, later embodied in the Corporation act of 1875 (now section 4 of our Corporation act), that "the charter of every corporation which shall hereafter be granted by or created under any of the acts of the legislature, shall be subject to alteration, suspension and repeal in the discretion of the legislature." In 1925 the legislature authorized trust companies and banks to merge, by agreement assented to by a vote of two-thirds of all the members of the respective boards of directors of the merging companies, approved by the vote of the stockholders owning at least two-thirds in amount of the stock of the respective corporations; the agreement to specify the corporation to receive into itself the merging corporation, and the conditions of the merger and the mode of carrying it into effect; copies to be filed with the banking commissioner and recorded in the county clerk's office. The act provides for compensation to dissenting stockholders *Page 415 
by appraisers appointed by a justice of the supreme court. It is objected that the statutory authority to merge cannot be exercised by the directors and stockholders of the savings investment company, against the will of the complainants, because to do so would impair the obligation of the corporations' contract with its stockholders, and the undertaking inter sese
of the stockholders, in violation of the fundamental law. Kean
v. Johnson, 9 N.J. Eq. 401; Zabriskie v. The Hackensack andNew York Railroad Co., 18 N.J. Eq. 178; Black v. Delaware andRaritan Canal Co., 24 N.J. Eq. 455, and Mills v. CentralRailroad Co., 41 N.J. Eq. 1, relied upon by the complainants, settled the law in this state, that articles of incorporation constitute a contract between stockholders to engage only in the enterprise stipulated to be undertaken, and for the prosecution of which they contributed their capital for mutual gain, and that any radical change in the object for which the corporation was formed, even by legislative permission or mandate, violates the obligation of their contract. In this respect the cases apply the common law of co-partnership to stockholders. They are authority for the proposition that a majority of the stockholders cannot alter their contract inter sese, though the legislature authorized it; i.e., that the reserved power of the state over corporate grants was not intended to authorize a majority of stockholders to change the contract. The doctrine is, of course, to be applied subject to the police power of the state, and it has no place if the articles of incorporation or the statute under which corporations come into being, permit such changes. The power of the state, however, under its reserve power, to alter or amend charters, in respect of the contract createdbetween the state and the corporation, is absolute, to protect the rights of the public, carry into effect the original purposes of the grant, and to promote the due administration of corporate affairs; and if, incidentally, injury to stockholders ensues, they must submit under their implied contract with the state to suffer it. The office of the reserve power, in our organic and statutory law, is to safeguard the public interests in corporate grants, which without the reservation would under the rule in theDartmouth *Page 416 College Case be an irrevocable contract. Under the reservation, Justice Gray says, in Inland Fisheries Commrs. v. HolyokeWater Power Co., 104 Mass. 446; 15 Wall 500, and it has been universally accepted as the true rule, the state is authorized to make any alteration or amendment in a charter granted subject to it, which will not defeat or substantially impair the object of the grant, or any rights which have vested under it, and that the legislature may deem necessary to secure either that object or other public or private rights; and, accordingly, under the reserve power, subsequent legislation has been held to be constitutionally valid, which changed the voting rights of stockholders. Miller v. New York, 15 Wall 478, gave lot owners control of a cemetery; Close v. Glenwood Cemetery,107 U.S. 466, permitted cumulative voting; Looker v. Maynard,179 U.S. 46, permitted insurance companies to change from assessment to regular life plan; Polk v. Mutual Reserve Fund LifeAssurance Association, 207 U.S. 310, made it unlawful to maintain a college for the education of white and colored pupils;Berea College v. Kentucky, 211 U.S. 45, and, to issue preferred stock upon the consent of two-thirds stockholders where unanimous vote was previously required. Hinckley v.Schwarzchild S. Co., 95 N.Y. Supp. 357; 193 N.Y. 599. InBerger v. United States Steel Corp., 63 N.J. Eq. 809, our court of errors and appeals indicated that by virtue of it preferred stock could be authorized to be retired in exchange for bonds. In Schwarzwaelder v. German Mutual Life Insurance Co.,59 N.J. Eq. 589, it held that a mutual insurance company could not, by legislative authority, change to a stock company against the will of a policy holder, because it impaired the obligation of his insurance contract, and in Allen v. Francisco SugarCo., 92 N.J. Eq. 431, it held that a lease of all the assets of a company to another, for all the latter's capital stock, under an enabling act, to be invalid as depriving the complaining stockholder of control over his proprietary rights. Tested by the rule first stated, the pressing question is, Does the act essentially change the character of the grant to the savings investment company and thus trench upon the contract of the complainants *Page 417 
with their fellow-stockholders? The form of the exercise of the reserve power is immaterial. It may be by mandate, or be authorized upon acceptance by the directors or stockholders, or both. Where the legislature authorizes a course of procedure whereby a charter may be amended, action in conformity thereto does not make the amendment, but it comes into existence through the operation of the statute. The amendment is the act of the legislature, the same as the charter, and neither has existence except as conferred by the statute. Lord v. Equitable LifeAssociation Society, 194 N.Y. 212. The merger statute, as a legislative enactment, is constitutionally unassailable. It has the force of law with corporations which accept its provisions, and with those upon which it is imposed by virtue of the reserved power, against their will, unless, as we have seen, it will defeat or substantially impair the object of the grant; in this case the grant to the savings investment company. It may be conceded, for the purposes of the case, that the complainants, as stockholders, have vested interests in the integrity of their company, and that they may maintain that it carry on the banking business according to the original grant, under its own banner and management; and it also may be admitted that a contract of merger which requires a stockholder to surrender his stock in a company in which he has invested his capital for the stock of another company, of which he declines to become a member, works a fundamental change. Clearwater v. Meredith, 1 Wall 25; NewOrleans J. G.N.R.R. Co. v. Harris, 27 Miss. 517; Lauman v.Lebanon Valley Railroad Co., 30 Penn. 42. But the latter situation does not confront the complainants. The savings investment company will continue after the merger, as always, with promise of greater power and prestige. The other two merging companies will pass out of the picture. The savings investment company will retain its franchise and absorb theirs. Privileges will be added to its grant instead of suffering impairment. The newly granted power to increase its capital stock, five thousand shares, to meet the requirements of the merger, will not impair any vested *Page 418 
rights of the complainants, as stockholders. They have no vested right of participation in the additional stock, or an equity in proportional shares, as they would have if the stock were to be sold for cash. Way v. American Grease Co., 60 N.J. Eq. 263.
The company has the power to issue stock for property or for the stock of other companies. And the power to issue additional stock to acquire the property of the other two companies by merger marks no departure from the original grant. The merger, in effect, amounts to a purchase of the capital stock of the other two companies, their assets and franchises, and the issuing of capital stock in payment was a power which the savings investment company had under its original grant, for, by the ninth section of the Corporation act of 1875, every corporation, however formed, was vested with the power and subject to the restrictions of that act, and by the fifty-fifth section all corporations were authorized to issue stock for property purchased, or for the capital stock of another company. The Merger act amplifies the original grant to the savings investment company consistent with the grant, and that the legislature had the right to do.
The decision would be the same if the savings investment company were one of the companies whose franchises was to be merged and extinguished, but for a different reason. Trust companies and banks, while not public utilities, in the technical sense, for they may select their depositors and deny borrowers, are, nevertheless, public agencies in the sense that through them the industry, trade and commerce of the country are carried on, and are universally recognized as affected with an important public interest, and subject to police regulation. The present day thought, in financial and commercial circles, tends towards banking institutions of large and centralized capital, with branch agencies, to better assure stability, stimulate public confidence, afford greater convenience and accommodation in large as well as small businesses, and security for patrons and stockholders than that afforded by the system now in vogue, of smaller local concerns of limited facilities. And to this trend the federal government has given its support by the so-called McFadden *Page 419 
bill, and this state, by adopting the branch bank system, and its ally, the Merger act. This manifestation of policy of state and nation bids judicial consideration in giving effect to the reserve power of the state over corporations which are privileged to profit in business of public concern. The legislative expression predicates the Merger act to be in the public interest — peculiarly a legislative function — and also to be within the reserve power over corporate contracts. The reserve power torepeal charters is absolute. Every corporation accepts the corporate privilege with notice that it may be withdrawn at the will of the legislature. The extinction of a charter by merger is nothing short of a repeal of the charter to a stockholder unwilling to go along with the merger. As to him the merger is not an alteration or amendment of the grant, but a complete destruction of it. Destroying, the state has a care not to take away or destroy the stockholder's investment, and safeguards it by providing compensation by appraisal at fair value. In fine, with the compensation provision, there can be no longer any question as to the power of the state under the reserve power to repeal, alter or amend the charter of any corporation in any respect, if the change be in the public interest. This view was entertained by the New York supreme court, and affirmed by the court of appeals, in Colby v. Equitable Trust Co.,108 N.Y. Supp. 978; 192 N.Y. 535. It finds support in the almost uniform legislative practice of the states, of providing compensation in corporate consolidations, and in the approval by our court of errors and appeals, as being in the nature of an exercise of the power of eminent domain. N.J. H.R.R. Co. v. AmericanElectrical Works, 82 N.J. Law 391. In Black v. Delaware andRaritan Canal Co., supra, the companies were technical public utilities, possessing the power to condemn, and it was considered that they could take the stock of a dissentient stockholder, who held under an irrepealable charter. The principle of that case is apposite to the delegation of power to banks and trust companies to take private property for the public use to which the legislature committed these institutions by the act. And if it be harkened back to the question of the contractual *Page 420 
rights of stockholders inter sese, and the complainants' rights to the solidarity of the savings investment company, their rights are not impaired, for, as against their associates, they have no right to continue in business under the corporate grant longer than the majority is willing. The duration of the corporation was unlimited. 22 N.J. Eq. 404.
The next objection is: That the savings investment company is not one of the class of trust companies authorized to merge. The assertion is literally true. The Merger act of 1925 authorizes one or more trust companies organized under an act concerningtrust companies, Revision 1899, or under any special act, to merge with banks. As we have seen, the savings investment company was organized under the Safe Deposit and Trust Company act of 1885. When the revision of 1899 came into being, for the formation, thereafter, of trust companies, with enlarged powers and increased facilities for management and regulation, the act of 1885 was repealed, and companies theretofore created under general laws or special act were afforded the privileges of the revised act, and, accordingly, the savings investment company accepted the grant by amending its charter. It was further provided that the revised act shall be applicable to all trust companies theretofore formed, reserving to them all their rights and powers and retaining their liabilities. All trust companies were operating under the Revision of 1899 at the time the Merger act was passed in 1925, and it is plain, beyond question, that it was the intention of the legislature to embrace all trust companies, however created, for, no reason is apparent why the few formed under the act of 1885, and they are the only ones omitted, should be excluded. "Organized" was not used to denote "created," but in the sense of "operating." This interpretation is consistent with the legislative scheme, and it may be said with assurance that the savings investment company, by the bestowal of power of the Revision of 1899, and amending its charter, and availing itself of its privileges, was "organized" under that act, within the perview of the Merger act. The rule is, undoubtedly, that the right to merge cannot be enjoyed unless it be expressly granted; the power cannot be implied. Delaware *Page 421 ware and Raritan Canal v. Raritan and Delaware Bay RailroadCo., 16 N.J. Eq. 321, 372; Colgate v. United States LeatherCo., 75 N.J. Eq. 229. But the rule of strict construction against a grantee of the state is qualified by another, that such grant, and the statute making it, must receive a reasonable construction, and not be so construed as to defeat the intention of the legislature, and that the ambiguity must be such as is not removed by the settled rules of construction. Black v. D. R.C. Co., 22 N.J. Eq. 130, 401.
The objection, that the merger is unfair and inequitable, calls for careful judicial scrutiny of the plan, in view of the interests in the merger of interlocking directorates, and of interlocking interests of stockholders of the three concerns. The plan must be free from unfairness before the complainants can be put to their election, of joining their associates or taking compensation in lieu. Colgate v. United States Leather Co.,73 N.J. Eq. 72, 98. By way of preliminary observation it is permissible to say that the vote of the holders of eighty-five per cent. of the stock, in favor of the merger, is not calculated to impress the court that the plan is inimical to the interests of stockholders, and it is not persuasive that, in the march of progressive banking, this great body of stockholders, voting for the merger is, and the complainants are not, out of step. The Central Trust Company was formed late in 1926, with two thousand five hundred capital shares, and was controlled by the savings investment company. The East Orange bank, of two thousand five hundred shares, is an old concern. The president of the savings investment company is president of all three, and the Central Trust Company was his conception, and he allotted the shares to its subscribers, some of whom are shareholders of the savings investment company. Originally it was meant to be a subsidiary of the savings investment company — a branch bank, until the banking commissioner objected, because of the legislature's refusal, up to that time, to countenance branch banks until the federal government had adopted the system by the passage of the McFadden bill. The combined share holdings of the directors in the respective companies *Page 422 
are less than twenty-five per cent. When the agreement of merger was executed, April 5th, 1927, the savings investment company's outstanding issue was ten thousand shares. The merger called for an additional issue of five thousand shares, to exchange for the two thousand five hundred shares of each of the companies to be taken in. For the purpose of the exchange, the value of the shares of the savings investment company was fixed at $350; the East Orange bank $250, and the Central Trust Company at $175. The difference in value was to be paid to the savings investment company in cash. The value of East Orange shares is not questioned. The real complaint is, that the basis upon which the stockholders of the Central Trust Company are to be let in to stockholding in the savings investment company is inequitable; that the exchange, share for share, plus the cash, is not fairly equal, in that the stockholders of the Central Trust Company are not paying enough for the privilege of merging.
The Central Trust Company had just opened its doors in a rented building, upon which it has an option to purchase, in a business commanding location in East Orange, with a paid-in capital of $150 per share. Its board of directors is of the usual composition, men of exceptional worth and business influence, and the infant member, in the family of banks, was not without promise of militancy and prosperity. That its stock was reasonably worth $175 cannot be justly challenged, and it is not, seriously. The cash capital, plus the license alone, warrants the figure, according to common experience. The savings investment company is a well-managed and prosperous institution. The market value of its stock is established by satisfactory proof to be $350 per share. Evidence of a few sales of odd, five and ten share, lots, to round out individual blocks, at, approximately, fifty points higher, and from which it is argued that the value per share is $387.50, does not disturb the soundness of the proof of the merger value at prevailing prices in a normal market. The book value is $203.60 per share, and the difference between that and the market or merger value, $146.40 per share, is *Page 423 
set down to so-called good-will. The book value is made up of items of assets and liabilities, and their value and amounts, as appears in detail upon the books of the company, and as reported to and examined by the state banking department; all of which in condensed form is submitted annually to the stockholders and the public generally. To show that the book value is greater, the complainants point out that it should be augmented by the increase in value of the bank buildings, which are carried on the books at cost, less depreciation; by $217,000, increase in value of bonds and mortgages, over cost; by $300,000 reserved for depreciation in securities, and by the value of the old bank fixtures and furniture, wholly written off. Under dissolution and distribution of the assets these items of property, unquestionably, would all have to be accounted for at their fair or sales value, but then there would be no accounting for the good-will. In merger values they form an indefinite part of that elastic term, goodwill, with little or no influence on the market value. The things, contemplated by the statute to be taken in exchange, in merging going concerns, is not assets for assets, but share for share of capital stock, upon parity of value, and the measuse of equality is the fair market value. The complainants also stress the obvious disparity between the savings investment company's established trade, and annual earning capacity of $158,000 on its $17,000,000 of deposits, and the paucity of both these elements of value in the infant corporation, and by a method of computation, satisfactorily to themselves, at least, show that parity in this respect would require that the Central Trust Company contribute earning capital of $1,600,000 instead of $812,500, the amount to be paid in by its stockholders, and contend that this inequality in contribution of earning dollars, in round figures $800,000, stamps the merger as unfair. If the argument is correctly understood, it means that to maintain parity of values, in dollar earning capacity, the Central Trust Company should come into the merger with $800,000 of deposits. That sum is inconsequential, even with a new bank, and, no doubt, was discounted, as readily acquirable with a week or two of intensive *Page 424 
operation. However, the argument altogether loses sight of the fact that the stockholders of the Central Trust Company are paying for this shortcoming in the premium of $146 per share, exacted for the savings investment company's stock; the good-will. And compensation to the savings investment company, for these subordinate inequalities, is deemed to be found, and it is sustained by the testimony of experienced bankers, in the extension of its grant into a new and pre-empted field of commercial activity; in the prestige and increased traffic to be brought to it by the prominence and influence of the newly associated directors and stockholders, and all that flows from a combination, brains, wealth and opportunity; all of which was reflected in the sharp advance in the market value of the stock of the savings investment company, as merged, to $400 per share, when the pending merger was first rumored. In such circumstances, when neither fraud nor bad faith motivates the vast majority of stockholders which favors the merger, and the minority is not oppressed or wronged, a court of equity ought not to interfere. In guarding the rights of the minority care should be taken not to injure the interests of the majority. The principle that should govern the court is tersely stated by Judge Peckham, of the New York court of appeals, in Gamble v. Queens CountyWater Co., 123 N.Y. 91, and adopted in Colby v. EquitableTrust Company, supra; the latter a case of striking resemblance to this one. It is there said, that "it is not, however, every question of mere administration or of policy in which there is a difference of opinion among the shareholders that enables the minority to claim that the action of the majority is oppressive, and which justifies the minority in coming to a court of equity to obtain relief. Generally, the rule must be that in such cases the will of the majority shall govern. The court would not be justified in interfering even in doubtful cases, where the action of the majority might be susceptible of different construction. To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint-stock association, as against the contemplated action of the majority, where such *Page 425 
action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequence to the company and in a manner inconsistent with its interests. Otherwise the court might be called upon to balance probabilities of profitable results to arise from the carrying out of the one or the other of different plans proposed by or on behalf of different shareholders in a corporation, and to decree the adoption of that line of policy which seemed to it to promise the best results, or at least to enjoin the carrying out of the opposite policy. This is no business for any court to follow."
The savings investment company is the owner of one thousand shares of the East Orange bank, and as part of the merger agreement offers these shares, proportionally, to the stockholders of its company, as merged, at their market value, the shares not taken to be sold. The complainants claim unfairness, because they will be compelled to put up a large amount of money, against their will, to protect their interests. If the savings investment company has the right to merge, and, it is held, it has, and the complainants elect to join in the merger, there is no warrantable cause for complaint that the complainants cannot accommodate themselves to the equitable offer. A similar complaint was made and denied in Farmers Loanand Trust Co. v. Hewitt, 94 N.J. Eq. 65; affirmed, Ibid. 187.
 The bill will be dismissed. *Page 426